No. 51,883

STATE OF KANSAS, *Appellee,* v. DOUGLAS L. WILLIAMS, *Appellant.*

(623 P.2d 1334)

Opinion filed February 28, 1981.

*Russell Shultz,* of Shultz, Fisher, Monnat & Shultz, of Wichita, argued the cause and was on the brief for the appellant.

*Geary Gorup,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Douglas L. Williams (defendant-appellant) guilty of felony murder (K.S.A. 21-3401) and aggravated burglary (K.S.A. 21-3716). The appellant raises three issues on appeal. He contends that (1) two search warrants were not supported by probable cause, (2) there was insufficient evidence to support the verdict, and (3) the trial court erred in its instructions to the jury.

The appellant was arrested, along with Allen R. Jordan, in connection with the rape and brutal slaying of Kay L. Robinson. Jordan was convicted of rape, aggravated burglary and felony murder in a separate trial held prior to the appellant's trial. Jordan's convictions were affirmed by this court in *State v. Jordan* (case No. 51,894, unpublished opinion filed December 6, 1980).

Kay was a high school senior at Augusta High School, in Butler County, Kansas. Kay worked part-time at a restaurant in Augusta, where she got off work at about 10 p.m. on May 8, 1979. She stopped and bought cigarettes at a gas station, then drove her car to the apartment of her boy friend, Mike Roger. Kay arrived alone at the apartment between 10:15 and 10:20 p.m. Mike Roger's apartment was on the second floor of a four-plex apartment unit. Bonnie Boone and her two minor sons lived in the apartment below Roger. Bonnie noticed when Kay arrived, and heard Kay enter the apartment. Near 11 p.m., Bonnie heard the sound of something falling on the floor of the apartment above her. When Mike Roger arrived home from work, about 1:30 a.m., he discov-

ered the apartment was dark, and the door unlocked. Mike found Kay's body lying nude on the bed; her throat was cut.

The police investigated the crime scene and routinely questioned the occupants of all four apartments in the four-plex. The appellant and a female companion, Becky Young, lived in the second floor apartment across from Roger's apartment. They shared the apartment with Jordan and his female companion, Sheila Williams. Sheila Williams was the appellant's sister. Each woman had a minor child who also lived with them.

On May 11, 1979, on the basis of an affidavit and application sworn before a judge of the district court, search warrants were issued for numerous items to be found in the residence or on the bodies of Jordan and the appellant. Among the items sought were knives, clothing, and blood and hair samples. On the basis of an affidavit and application sworn before a judge of the district court on June 15, 1979, search warrants were issued for saliva samples to be taken from Jordan and the appellant.

The appellant first contends that all evidence seized pursuant to the two search warrants should have been suppressed due to insufficient probable cause, and failure to comply with the Kansas Bill of Rights. Specifically, the appellant admits there was probable cause for the search warrants to issue as to Jordan, but argues that his own connection with the crime was speculative and based upon remote circumstantial evidence.

*State v. Morgan,* 222 Kan. 149, 151-52, 563 P.2d 1056 (1977), contains a summary of the principles pertinent to this issue. There the court stated:

"It is an elementary rule of law that a search warrant may not issue except on a showing of probable cause. The warrant must particularly describe the person, place or means of conveyance to be searched and the things to be seized. (K.S.A. 1976 Supp. 22-2502; *State v. Gordon,* 221 Kan. 253, 559 P.2d 312.) Sufficient facts must be placed before the issuing magistrate to enable him to make an intelligent and independent determination that probable cause exists. Bald conclusions, mere affirmations of belief, or suspicions are not enough and, while an affidavit may be based on hearsay, there must be sufficient affirmative allegations of fact as to affiant's personal knowledge to provide a rational basis upon which a magistrate can make a judicious determination of probable cause. (*Aguilar v. Texas,* 378 U.S. 108, 12 L.Ed.2d 723, 84 S.Ct. 1509; *Giordenello v. United States,* 357 U.S. 480, 2 L.Ed.2d 1503, 78 S.Ct. 1245; *Nathanson v. United States,* 290 U.S. 41, 78 L.Ed. 159, 54 S.Ct. 11; *State v. Hart,* 200 Kan. 153, 162, 434 P.2d 999.)

" 'Probable cause' to issue a search warrant is like a jigsaw puzzle. Bits and pieces of information are fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been or is being committed and

that evidence of the crime may be found on a particular person or in a place or means of conveyance. (K.S.A. 1976 Supp. 22-2502.) In *State v. Lamb,* 209 Kan. 453, 497 P.2d 275, this court explained:

" 'Probable cause' to arrest refers to that quantum of evidence which would lead a prudent man to believe that the offense has been committed. (*Henry v. United States,* 361 U.S. 98, 102, 4 L.Ed.2d 134, 80 S.Ct. 168 [1959].) It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the information led a reasonable officer to believe that guilt is more than a possibility, and it is well established that the belief may be predicated in part upon hearsay information. (*Draper v. United States,* 358 U.S. 307, 3 L.Ed.2d 327, 79 S.Ct. 329 [1959].) The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. (*Wong Sun v. United States,* 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407 [1963].)

" 'Probable cause' exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. (*Carroll v. United States,* 267 U.S. 132, 162, 69 L.Ed. 543, 45 S.Ct. 280 [1925].)

" 'Evidence sufficient to support probable cause for an arrest on the part of an arresting officer is also sufficient to support a finding of probable cause by a magistrate in the issuance of a search warrant.' (p. 467.)

"The burden is on the prosecution to show a search and seizure was lawful and supported by probable cause (K.S.A. 22-3216[2]; *State v. Youngblood,* 220 Kan. 782, 785, 556 P.2d 195); but once a search warrant has been issued, supported by an affidavit which recites facts sufficient to find probable cause, prima facie evidence of a lawful search and seizure is established. (79 C.J.S., Searches and Seizures, Sec. 98, pp. 917-18. See also, *State v. Yates,* 202 Kan. 406, 449 P.2d 575; *State v. Emory,* 193 Kan. 52, 391 P.2d 1013, cert. denied, 379 U.S. 906, 13 L.Ed.2d 179, 85 S.Ct. 200.)"

We note that the appellant did not dispute the truthfulness of material factual allegations in the affidavit and application for search warrant, but merely disputed the sufficiency of those facts to support a finding of probable cause. As a result, matters in the affidavit are accepted as true. See *State v. Jacques,* 225 Kan. 38, 587 P.2d 861 (1978). Under the facts presented, if there was probable cause for the searches, no additional proof was required merely because pubic hairs, blood samples, and saliva samples were sought. See *Schmerber v. California,* 384 U.S. 757, 16 L.Ed.2d 908, 86 S.Ct. 1826 (1966).

The facts of this crime presented the police a central figure for their investigation—Allen Jordan. However, bits and pieces of circumstantial evidence also drew the appellant into the center of the police investigation. The same circumstantial evidence pro-

vided more than mere suspicion that the appellant may have been involved in the commission of the crime. The district court, when presented with the sworn affidavits and applications for the search warrants, correctly found probable cause and issued the search warrants as to both Jordan and the appellant.

Briefly summarized, the application and affidavits for the first search warrants contained the following information. At the time of the initial search warrant applications the police were confronted with the victim of a homicide and probable rape. The victim's eye glasses were found beside her body on the bed. Fingerprint analysis positively identified fingerprints found on the eyeglasses as Jordan's. An unplugged clock was found on the floor in the bedroom; the clock had stopped at 10:55. No sharp object immediately identifiable as the murder weapon was found in the apartment. These facts were known to police through firsthand investigation.

Preliminary results of an autopsy confirmed the cause of death as massive bleeding from wounds which severed the arteries in the neck. The autopsy also discovered an abrasion on the victim's left shoulder, which was theorized as probably being caused by a metal wrist watch band. An ultraviolet light examination of the vaginal area indicated the possible presence of semen. Based upon the lack of clothing on the body when found, and the preliminary autopsy examination, the police concluded the victim had recently had sexual intercourse. The police knew from experience that the KBI laboratory would be able to examine the semen and determine its blood type grouping. Other material, residues, and hair fibers found on or near the victim's body were also capable of being identified and compared by a laboratory analysis. These facts were known to the police from experience, firsthand investigation, or reliable autopsy results.

Police interviews established the probable time frame and other important facts. Bonnie Boone was interviewed and determined to be a reliable witness, with no apparent motive to lie or distort the truth. The time of the victim's arrival, according to Bonnie, was between 10:15 and 10:20 p.m. This coincided with independent facts from other sources; the police knew Kay got off work at 10:00 p.m. and had stopped and bought cigarettes before arriving at the apartment parking lot. Bonnie told police she saw only one car arrive and did not hear anyone yell at Kay when she

arrived. Bonnie told police her apartment window was open at the time Kay arrived, but that she closed the window before she went to bed. Bonnie described sounds she heard, including the sound of something hitting the floor near 11:00 p.m. Independently, and under hypnosis, Bonnie described the shadow of a person she observed outside her window shortly after 10:30 p.m. The person was described as about 6′ tall, average build and short to medium length hair; this description fit the general apperance of Jordan.

In two separate interviews, Jordan told the sheriff and police that Kay arrived home a few minutes before 10:00 p.m. Jordan said he went outside and talked with Kay for a few minutes, then returned inside. The appellant told police that Kay arrived home at 10:00 p.m., as the television show "Starsky and Hutch" was completed. The appellant heard Jordan holler at Kay, and knew that Jordan had left for about five minutes.

Jordan had told the police of a previous conviction for robbery, and his present parole status. A fingerprint card was obtained and prints found on the victim's eyeglasses were compared. A KBI fingerprint expert found twelve points of positive identification, thus linking Jordan to the offense. The police also obtained criminal record information from the Wichita Police Department, which revealed that a complaint had once been filed against Jordan concerning rape and indecent liberties with a child. The victim was a fourteen-year-old female who was visiting her boy friend. The boy friend resided in the same apartment complex as Jordan. The victim positively identified Jordan and lab tests indicated the victim had had sexual intercourse. A felony charge of indecent liberties with a minor was filed against Jordan, but no prosecution occurred because of the victim's psychological inability to testify.

The police investigation of the crime scene indicated that the wounds which severed the victim's arteries may have transferred blood from the victim to the body or clothes of the assailant, or assailants. Police also hypothesized that the assailants would have to wash their clothes to remove the victim's blood. The manner in which the body was found, with the victim's arms parallel to her sides, led the police to believe the victim may have been held in a prone position by one person while another person slashed her throat.

The police compared the statements of Bonnie Boone with those of Jordan and the appellant. The police could determine no reason why Bonnie would be untruthful. There was clearly sufficient reason to believe Jordan may have lied. The police had solid evidence incriminating Jordan—his fingerprints and prior record. The appellant's story was essentially identical to Jordan's story. Both of their stories were inconsistent with Bonnie's story. In addition, Jordan wore no wrist watch; police had observed the appellant wearing a watch with a metal band, which may have caused the abrasion on the victim's left shoulder.

Contrary to the appellant's contention, it was not impermissible speculation or mere surmise for the police to conclude two persons committed the crime. The condition of the victim's body, including the position of her arms, the abrasions on her shoulder and lack of defensive wounds, provided a rational basis to conclude that there may have been two assailants. Direct evidence connected Jordan to the crime. The appellant was a logical suspect because he claimed to have been with Jordan in their apartment at the time the crime occurred. We conclude the first search warrant was supported by probable cause.

There is no merit to the appellant's claim that the warrants were unconstitutional "general warrants." On its face the first warrant described all categories of items with as much specificity as the facts permitted. Each of the items specified were needed for proper investigation of the facts as they were outlined in the affidavit/application. In *State v. Ames,* 222 Kan. 88, 92, 563 P.2d 1034 (1977), this court stated:

"The Fourth Amendment to the United States Constitution and Section Fifteen of the Bill of Rights of the Kansas Constitution prohibit warrants except those 'particularly describing the place to be searched, and the persons or property to be seized.' The purpose of this requirement is to prevent general searches and to prevent the seizure of an item at the discretion of the officer. *Stanford v. Texas,* 379 U.S. 476, 13 L.Ed.2d 431, 85 S.Ct. 506. The test is one of practical accuracy rather than one of technical sufficiency, and absolute precision is not required in identifying the property to be seized. *United States v. Ventresca,* 380 U.S. 102, 13 L.Ed.2d 684, 85 S.Ct. 741; 3 C. Wright, Federal Practice and Procedure, Criminal, Sec. 670 (1969)."

The second application and affidavit for a search warrant also passes constitutional muster. The police sought saliva samples from both defendants. Investigation and lab analysis had disclosed the presence of semen in the victim's vagina, and addi-

tional stains and residues were found on the bedding where the victim had lain. The KBI had performed blood grouping tests which indicated the stains and residues found at the crime scene came from a person or persons who were "secretors." Saliva samples were needed from the defendants in order to determine whether or not either of them was a secretor. We conclude the second search warrant was specific, reasonable, and supported by probable cause.

The appellant next contends the trial court erred in failing to grant a judgment of acquittal on all charges at the conclusion of the State's evidence, and that the evidence was insufficient to support the verdict. The trial court granted a judgment of acquittal on one count of aiding a felon, but retained the charges of rape, aggravated burglary, and felony and premeditated murder.

The rules used to determine sufficiency of the evidence are frequently cited. A trial judge in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. Mack,* 228 Kan. 83, 89, 612 P.2d 158 (1980) and cases cited therein. In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. Peoples,* 227 Kan. 127, 133, 605 P.2d 135 (1980), and cases cited therein. In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand. *State v. Peoples,* 227 Kan. at 133; *State v. Racey,* 225 Kan. 404, 407, 590 P.2d 1064 (1979). A conviction of even the gravest offenses may be sustained by circumstantial evidence. *State v. White & Stewart,* 225 Kan. 87, Syl. ¶ 14, 587 P.2d 1259 (1978).

There is no merit to the appellant's contention that the instant case is identical to *State v. Doyle,* 201 Kan. 469, 441 P.2d 846 (1968). We note that the Doyle decision is frequently distin-

guished because of its peculiar facts. See *State v. Foster*, 229 Kan. 362, 623 P.2d 1360 (1981).

This issue necessitates a review of the evidence presented at trial. The testimony of Eileen Burneau, a KBI criminologist, provided the strongest evidence circumstantially connecting the appellant to the crime. Ms. Burneau analyzed stains found on the bedspread; she found blood stains and seminal fluid stains. The blood type of the blood stains was determined to be the same as the victim's blood type. It was determined that the seminal fluid was from a person who was a blood type A secretor. Ms. Burneau testified that in the ABO blood typing system, approximately 48 percent of the population have type O blood, 41 percent have type A blood. Approximately 80 percent of the population are secretors. Laboratory analysis of the appellant's blood determined that he is a type A secretor. Ms. Burneau testified she could not determine the length of time the seminal fluid had been present on the bedspread. Mike Roger, the victim's boy friend, testified that the bedspread had been washed about two weeks before the crime. He also testified that no one had engaged in intercourse on the bedspread in the intervening time.

Laboratory analysis of vaginal specimens detected the presence of seminal fluid from a type O secretor. Jordan and Roger are type O secretors. No seminal fluid from a type A secretor was found inside the victim's vagina.

Two additional items of physical evidence were presented which the State relied on to connect the appellant circumstantially with the crime—one empty cigarette package and one pubic hair. The victim bought a package of Marlboro Light 100 cigarettes on her way to Roger's apartment. When police examined her purse, they found one partial package of Marlboro Light 100's containing nine cigarettes. A search of the appellant's sister's car two days after the crime provided one empty package of Marlboro Light 100's, which was found in a trash bag on the rear seat of the car. Fingerprint analysis identified one print made by the appellant; no prints identifiable as the victim's were found on the empty package. The police and county attorney theorized that the appellant took the full package from the victim, smoked the cigarettes, and then discarded the empty package in the car trash bag before his arrest two days after the crime. The appellant presented testimony from several persons that provided equally

valid explanations. The appellant smoked regular Marlboro filtered cigarettes, but had been known to smoke Marlboro Light 100's. The appellant's father smoked Marlboro Light 100's, and testified that the appellant sometimes smoked those cigarettes. Becky Young, the appellant's live-in girl friend, testified that she was smoking Marlboro 100's at the time of the crime.

The police and KBI agents collected and analyzed clothing, bedding, and hairs from the crime scene and victim. The first search warrant provided head, body and pubic hairs from both suspects. In a search of the appellant's sister's car, the police found a box in the rear seat containing several items of clothing. In the box they found a pair of men's brief-style underwear. A KBI criminalist compared known hairs taken from the victim, Roger, and the suspects, with a *single hair* found on the underwear. The hair had the same microscopic characteristics as a pubic hair taken from Roger. The county attorney did not mention this item of evidence in his appellate brief, but apparently it was theorized that the appellant had worn the underwear during the commission of the crime, and the underwear picked up the single pubic hair, and the appellant later discarded the underwear into the box in the car. Testimony at trial revealed that both the appellant and Jordan wore brief-style underwear, that Jordan sometimes wore boxer-style underwear, and that Jordan sometimes wore clothes belonging to the appellant. Both men had equal access to the car where the underwear was found. The car belonged to the appellant's sister; she was also Jordan's live-in girl friend. (Neither the county attorney nor the appellant mention this evidence in their appellate briefs.)

The State relies heavily upon what it believes are incriminating inconsistencies and contradictions between the appellant's statements and the statements of Bonnie Boone. According to the State, the fact that the appellant's statements closely parallel Jordan's statements is circumstantial evidence of guilt.

During the first interview with police, the day after the crime, the appellant told them the approximate time when Kay arrived home was at the end of the television show "Starsky and Hutch." The appellant recalled that Jordan yelled at Kay, then left and spoke to her for about five minutes. He told police that Jordan returned and that he then went to sleep while watching television.

The second interview was on May 11, after the appellant and Jordan had been arrested. The appellant voluntarily waived his right to remain silent and told police about the events the night of the crime. The appellant told police he drank a few beers and some rum that evening. Between 10:00 and 10:15 p.m., Jordan hollered at Kay, then left and talked with her. When Jordan returned the appellant recalled that Jordan made a comment "about how good looking the girl was next door; that he would sure like to get in her pants." The appellant also stated that a few minutes after Jordan made the comment, he hollered at the appellant and said that he (Jordan) was going next door and would be back in a minute. The appellant said he then went back to the couch, laid down, and went to sleep. He did not recall or know when Jordan returned. He woke up when the girl friends returned near midnight. The alleged incriminating inconsistency is in the second interview, when the appellant recalled Jordan's statement about Kay being good-looking and that the appellant did not recall when Jordan returned. The appellant testified on his own behalf that during the first interview he merely forgot Jordan's statement about sexual interest in the victim.

There were also inconsistencies between Bonnie Boone's testimony that Kay arrived home at 10:15 or 10:20 p.m., and the appellant's version that she arrived home near 10:00 p.m. The appellant said Jordan yelled out the window at Kay; Bonnie testified her windows were open and she heard no one yell at Kay, but she heard Kay's footsteps ascending the stairs.

Finally, the State emphasizes the inferences which may be drawn from these bits and pieces of circumstantial evidence. According to the State, the condition of the victim's body when found indicates that one person probably held her down while a second person cut her throat. The "condition" referred to is that the victim was found lying on her back, with her arms lying parallel and close to her body. Her fingers were curled slightly toward her palms. No defensive wounds were found on the victim's hands or arms, indicating she did not or could not attempt to ward off the fatal wounds.

This inference or theory is fundamentally sound. We recognized the validity of this tentative conclusion when the search warrant affidavits were analyzed. However, we note that a significant fact which was assumed true for purposes of the search

warrant was not developed in testimony at trial. In the first search warrant affidavit it is stated that Dr. Crane, who performed the autopsy, detected an abrasion on the victim's left shoulder which was probably caused by a metal wrist band. The appellant had been seen wearing a metal wrist watch band; Jordan had not been seen wearing a watch or identification bracelet. At trial, Dr. Crane testified about some superficial wounds to the outer skin on the top of the victim's shoulder. However, there is no testimony regarding the probable or suspected cause of the superficial wounds. In addition, there is absolutely no evidence in the record which indicates whether or not the appellant wore a wrist watch with a metal band. The first search warrant authorized the police to seize "all wrist watches and/or metal wrist bands."

The jury acquitted the appellant on charges of rape. They returned guilty verdicts on the charge of aggravated burglary and felony murder. The instructions included PIK Crim. 54.05 (1979 Supp.) on aiding and abetting another in the commission of a crime. In *State v. McDaniel & Owens*, 228 Kan. 172, 178, 612 P.2d 1231 (1980), we recited the familiar rule on sufficiency of evidence to support charges of aiding and abetting. After thoroughly examining the evidence in this case we are not satisfied that there was sufficient evidence to support the verdicts of guilty for aggravated .burglary and felony murder. There was insufficient evidence that the appellant entered the apartment with the intent to commit rape, or that he knowingly associated and participated in Jordan's commission of the rape and aggravated burglary. Absent sufficient proof of the underlying felony, the conviction for felony murder cannot stand.

Other issues raised by the appellant need not be addressed.

The conviction of the appellant on the charges of aggravated burglary and felony murder is reversed. It is directed that the appellant be discharged.