No. 51,883

STATE OF KANSAS, *Appellee*, v. DOUGLAS L. WILLIAMS, *Appellant*.

(630 P.2d 694)

Opinion denying a rehearing filed June 17, 1981. (For original opinion reversing the judgment of the trial court, see 229 Kan. 290, 623 P.2d 1334 [1981].)

*Russell Shultz,* of Shultz, Fisher, Monnat & Shultz, of Wichita, for the appellant.

*William P. Ronan,* county attorney, *Geary Gorup,* former county attorney, and *Robert T. Stephan,* attorney general, for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: The opinion of the court reversing the conviction of Douglas L. Williams was filed on February 28, 1981. *State v. Williams,* 229 Kan. 290, 623 P.2d 1334 (1981). Within the time allotted by Supreme Court Rule 7.06 (225 Kan. xlviii) the State filed a motion for rehearing. Thereafter, pursuant to an order of this court, the appellant filed a response to the motion for rehearing. Finding nothing upon consideration of the motion for rehearing and response thereto which warrants a reconsideration of the case, the motion for rehearing is denied.

It is not unique in the jurisprudence of this state to reverse convictions in criminal cases, homicide or otherwise, where the record does not contain sufficient evidence to sustain the verdict of the jury. See *State v. Doyle,* 201 Kan. 469, 489, 441 P.2d 846 (1968), and cases cited therein. Recognizing, however, that such reversals are controversial and frequently misunderstood, we will state the applicable law in greater detail and seek to clarify the portion of the opinion concerning the absence of sufficient evidence to support the verdict of the jury.

The appellant was charged with aiding a felon, rape, aggravated burglary, felony murder, and premeditated murder. The trial court at the close of the State's evidence granted a motion for judgment of acquittal on the charge of aiding a felon. In the history of our law this offense was previously prosecuted by charging the perpetrator as an accessory after the fact. The jury found the appellant not guilty of rape. On Counts One (premeditated murder) and Two (felony murder) the trial court submitted one combined verdict form with four alternatives: (1)

Guilty of premeditated murder; (2) Guilty of murder while in the commission of a felony; (3) Guilty of premeditated murder and murder while in the commission of a felony; and (4) Not guilty. Of these alternatives the jury found the appellant guilty of only one—murder while in the commission of a felony. It also found the appellant guilty of aggravated burglary, which provided the underlying felony for the felony murder.

Of the instructions given to the jury, the following are pertinent to our analysis:

"No. 5

"In Count One, the defendant, Douglas L. Williams, is charged with premeditated murder in the first degree. In Count Two, the said Douglas L. Williams is charged with murder committed in the perpetration of a felony. In this particular instance the felonies listed in the charge include rape or aggravated burglary. In order to establish the crime of first degree murder, either the elements of premeditated murder or the elements of murder committed in the perpetration of a felony must be proved. To each of these charges, the defendant pleads not guilty.

"To establish the charge of premeditated murder, each of the following claims must be proved:

"1.   That the defendant killed Kay L. Robinson;

"2.   That such killing was done maliciously;

"3.   That it was done willfully;

"4.   That it was done deliberately and with premeditation; and

"5.   That this act occurred on or about the 8th day of May, 1979, in Butler County, Kansas.

"You will also consider if the defendant is guilty of murder in the perpetration of a felony.

"To establish the charge of murder committed in the perpetration of a felony, each of the following claims must be proved:

"1.   That the defendant killed Kay L. Robinson;

"2.   That such killing was done while in the commission of a rape or an aggravated burglary, both felonies; and

"3.   That this act occurred on or about the 8th day of May, 1979, in Butler County, Kansas.

"No. 6

"Under Count Three, the defendant, Douglas L. Williams, is charged with the crime of rape. To this charge, the defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.   That the defendant had sexual intercourse with Kay L. Robinson;

"2.   That Kay L. Robinson was not the defendant's wife;

"3.   That the act of sexual intercourse was committed without the consent of Kay L. Robinson under circumstances when her resistance was overcome by force or fear or she was unconscious or physically powerless to resist; and

"4.   That this act occurred on or about the 8th day of May, 1979, in Butler County, Kansas.

"No. 7

"Under Count Four, the defendant, Douglas L. Williams, is charged with the crime of aggravated burglary. To this charge the defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.   That the defendant knowingly entered Apartment Number Two at 926 Lulu in the City of Augusta, Kansas;

"2.   That the defendant did so without authority;

"3.   *That the defendant had the intent to commit rape, a felony, therein* and that at the time there was a human being in Apartment Number Two, 926 Lulu, Augusta, Kansas; and

"4.   That this act occurred on or about the 8th day of May, 1979, in Butler County, Kansas.

.   .   .   .

"No. 11

"*A person is responsible for the conduct of another when, either before or during the commission of a crime, and with the intent to promote or assist in the commission of the crime, he intentionally aids or advises the other to commit the crime.*" (Emphasis added.)

In the original opinion we recited rules of law which guide the court in the determination of whether the record discloses sufficient evidence to support the verdict. Those rules are repeated here:

"The rules used to determine sufficiency of the evidence are frequently cited. A trial judge in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. Mack,* 228 Kan. 83, 89, 612 P.2d 158 (1980) and cases cited therein. In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. Peoples,* 227 Kan. 127, 133, 605 P.2d 135 (1980), and cases cited therein. In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand. *State v. Peoples,* 227 Kan. at 133; *State v. Racey,* 225 Kan. 404, 407, 590 P.2d 1064 (1979). A conviction of even the gravest offenses may be sustained by circumstantial evidence. *State v. White & Stewart,* 225 Kan. 87, Syl. ¶ 14, 587 P.2d 1259 (1978)." 229 Kan. at 296.

Convictions based upon circumstantial evidence, as in the instant case, can present a special challenge to the appellate court. Juries are permitted to draw *justifiable* inferences from proven circumstances and established facts; but the appellate court must

determine whether findings based upon inferences are *justifiable* by applying additional rules of law.

In *State v. Gobin,* 216 Kan. 278, 531 P.2d 16 (1975), this court reversed a felony conviction of attempting to steal swine. The proof in that case was entirely circumstantial, and we recited applicable appellate rules including the following: "Presumptions and inferences may be drawn only from facts established and presumption may not rest upon presumption or inference on inference." 216 Kan. at 280; see *State v. Doyle,* 201 Kan. at 488; *State v. Ragland,* 170 Kan. 346, 351, 226 P.2d 251 (1951).

Black's Law Dictionary 917 (4th ed. rev. 1968) defines an inference as "[a] process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted." See *Duncan v. Railway Co.,* 82 Kan. 230, 233, 108 Pac. 101 (1910) (where a discussion of inference and presumption is made). The presumption referred to is the permissive type, not the mandatory or conclusive presumption. See Stumbo, *Presumptions—A View at Chaos,* 3 Washburn L. J. 182, 190-91 (1964).

The rule which forbids the basing of an inference on an inference has received treatment and analysis in Annot., 5 A.L.R. 3d 100. In Kansas, the rule has been cited most frequently in civil cases, but it is recognized as "doubly applicable in criminal cases." *State v. Doyle,* 201 Kan. at 488, and cases cited therein.

The rule is restated in 1 Wharton's Criminal Evidence § 91, pp. 150-51 (13th ed. 1972):

"Another way, perhaps, of verbalizing the rule prohibiting an inference on an inference and a presumption on a presumption is the rule, as stated by some courts, that where reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances."

The rule against basing an inference on an inference has been discussed in more detail in Kansas civil cases. This court has said that what is meant by the rule forbidding the basing of one inference upon another inference is that an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. *Virginia Surety Co. v. Schlegel,* 200 Kan. 64, 434 P.2d 722 (1967). Permissible presumptions or inferences, as understood in the law of evidence,

must have substantial probative force as distinguished from surmise. *Farmers Ins. Co. v. Smith,* 219 Kan. 680, 689, 549 P.2d 1026 (1976). While reasonable inferences may be drawn from the facts and conditions shown they cannot be drawn from facts or conditions merely imagined or assumed. *Duncan v. Railway Co.,* 86 Kan. 112, 119 Pac. 356 (1911).

In the original opinion we recited allegations in the affidavits for the first and second search warrants designed to establish probable cause for the issuance of the warrants. These allegations of fact do not present evidence this court can review on an appeal from a conviction which challenges the sufficiency of the evidence to sustain the conviction. In fact, the evidence presented by the prosecution at the trial of the appellant fell short of the allegations in the affidavits in several material matters that were critical to establish the prosecution's theory of guilt in the case. Bits and pieces of circumstantial evidence supplied in the affidavits for search warrants, that tended to provide more than a mere suspicion that the appellant *may have been involved* in the commission of the crime, did not all materialize as evidence when the appellant was tried. Hair fibers alleged in the affidavits to have been found on or near the victim's body, which were capable of being identified and compared by a laboratory analysis, utterly failed to materialize to identify the appellant. Nothing on hair fibers found near the victim's body was presented at the trial of the appellant. The first search warrant affidavit stated that Dr. Crane, who performed the autopsy of the victim, detected an abrasion on the victim's left shoulder which was surmised to have been caused by a metal wrist band. The affidavit further alleged the appellant had been seen wearing a metal wrist watch band, and that Jordan had not been seen wearing a watch or identification bracelet. At the trial of the appellant, Dr. Crane testified about some superficial wounds to the outer skin on the top of the victim's shoulder, but there was absolutely no testimony in the record of the trial regarding the probable or suspected cause of these superficial wounds. Furthermore, there is no evidence in the record of trial which identifies the appellant as one who wore a metal wrist watch band. The first search warrant authorized the police to seize "[a]ll wrist watches and/or metal wrist bands" found among the possessions or in the apartment of Jordan and the appellant, Williams.

In the affidavit for the first search warrant it was stated: "Four brands of cigarettes have been found in the apartment, three of which have filter tips. A fourth non-filtered tip cigarette was found in an ashtray in the living room which cannot be accounted for by the officers investigating the crime after speaking to the people who would normally have access to the apartment." At the trial of the appellant no evidence of a non-filtered tip cigarette was introduced and no evidence was introduced concerning any cigarette butts in an ashtray in the apartment.

In the affidavit for the first search warrant it is stated:

"The affiant personally interviewed Bonnie Boone, who resides directly below the apartment in which the victim was found. Bonnie Boone has told the affiant that the victim returned to the fourplex at approximately 10:15 to 10:20 p.m. on May 8, 1979, this time being determined by her observing the weather report on the television. Mrs. Boone further advised the affiant that she heard one car enter the driveway and one set of footsteps going to the apartment door in which the victim was later found. Mrs. Boone later stated that she heard noises, as she often does, from the apartment above due to the way in which the fourplex was constructed. Mrs. Boone further advised the affiant that she heard the person above turn on the stereo, water running from the bathroom and other similar sounds. Mrs. Boone has further advised the affiant that a few minutes after hearing these sounds, she observed a shadow outside her bedroom window traveling from the south to the north to the general direction of the apartment door of the victim. Under hypnosis, Mrs. Boone further advised the affiant that the figure she saw was darkened due to the lighting conditions outside, but that she can describe it as a male, approximately six foot, with an average build and short to medium length hair. Mrs. Boone further advised the affiant under hypnosis, that figure she observed was in somewhat of a crouched position as if sneaking from one location to another. Mrs. Boone further advised the affiant both under hypnosis and while not under hypnosis that after seeing this figure she later heard a sound from the apartment above as if something were dropped. Experimentation performed by members of the Public Safety Department of Augusta with a fan in that apartment of the victim helped Mrs. Boone identify the sound that she heard on May 8 to be similar to the sound if not identical to the sound of the fan being knocked over. At the time of hearing this sound, she noticed that the stereo had been turned off. She further advised the affiant while not under hypnosis that she heard footsteps in the apartment above after hearing this sound similar to that of a fan being knocked over was heard by her. Mrs. Boone further stated to the affiant under hypnosis that she had fallen asleep by 11:30 p.m. on May 8, 1979."

At the trial Bonnie Boone testified she saw the victim's white Satellite car come into the gravel parking lot and park in front of Bonnie Boone's apartment. She recognized the car as belonging to Kay L. Robinson because Kay had come to the apartment complex and parked in front of her apartment on four or five

previous occasions. She heard the car door close, she heard footsteps of one person going up the stairs to Mike Roger's apartment which was above hers, and the only other sound she heard from the upstairs area at that time was the door closing after she heard Kay Robinson's footsteps go upstairs. There is no testimony in the trial record concerning Bonnie Boone's ability to hear sounds (stereo, water running from the bathroom and other similar sounds as recited in the affidavit). Bonnie Boone testified she heard no other sounds after that. She testified that after she got in bed she "got back up to shut the window." At that time she said, "*I saw a shadow walking by.*" (Emphasis added.) She described the shadow as "a person" walking north on the sidewalk in front of the apartments. She testified:

"Q. Did you notice any noise or conversation or anything like that out there at that time?

"A. No.

"Q. Did you hear any other sounds after you saw the shadow go by?

"A. No, I shut my window and turned on my fan.

"Q. And what did you do after that?

"A. Went back to bed.

. . . .

"Q. And did you notice anything else during the rest of that evening?

"A. Nothing.

"Q. Either audibly or visually or anything of that nature that evening after you went to bed?

"A. After I went to bed I heard something.

"Q. Okay. What did you hear?

"A. I heard a thud.

"Q. And could you tell from what direction that thud came?

"A. From upstairs.

"Q. The Mike Roger's Apartment?

"A. Yes.

"Q. And had you gone to sleep yet at this time?

"A. I was just getting ready to doze off.

"Q. And do you have any idea what approximate time that was?

"MR. WATKINS: Your Honor, we are going to object to this.

"(Mr. Watkins shows to Mr. Gorup some papers in a folder.)

"MR. GORUP: We withdraw the question, sir.

"Q. What did you do after you heard this thud?

"A. Well I sat up in bed but then I sat up in bed for a minute and then I laid back down and went back to sleep.

"Q. Did you hear anything, any noises after that?

"A. No.

"Q. Did you see Kay Robinson at all that night?

"A. No.

"Q. And, Mrs. Boone, getting back to this thud you heard, could you point out an approximate time of when you heard that?

"A. I can't remember for sure. It was—I'd think about 11:00 o'clock, something like that time. I am not for sure.

"Q. Did you look at a clock?

"A. I can't remember.

"Q. Okay. So that is just a guess you are giving us?

"A. Yes."

The officer making the affidavit stated the shadow of *a person* described by Bonnie Boone in the affidavit *fit the description of Jordan.*

The evidence established there was no connecting door between the second floor apartments. An occupant of Jordan's apartment was required to exit downstairs to the front of the apartments at the street level and walk north past Bonnie Boone's bedroom window to enter the stairway to Mike Roger's apartment.

The State in its motion for rehearing asserts:

"The Supreme Court erred in failing to recognize that the murder and sexual assault upon the victim must have been committed by no less than two separate male individuals. Once this Court accepts this fact from the evidence, the evidence when viewed in a light most favorable to the prosecution, clearly shows the guilt of the Appellant beyond a reasonable doubt."

The foregoing assertion clearly indicates the State's theory of the case is based upon the assumption the sexual assault upon the victim and the murder must have been committed by no less than two separate male individuals. The unproved supposition of the State presented in its brief on appeal to this court is that because the decedent's body was found lying on her back with arms at her sides, with no defensive marks on the decedent's hands or arms, *the perpetrator of the crime, Allen Jordan,* must of necessity have had an accomplice with him at the time of the commission of the crime.

It is apparent from the facts which are beyond dispute that Kay L. Robinson was raped and murdered. The State completely ignores the possibility that Jordan, who had a speaking acquaintance with Mike Roger, may have been allowed to enter Roger's apartment so that no burglary was, in fact, perpetrated. Furthermore, it is entirely possible when threatened with a knife and threatened with rape that Kay L. Robinson, a high school student, was so frightened that she submitted without resistance.

Recognition of these possibilities is not to say this court on review is reweighing the evidence to determine the facts. It simply illustrates that the jury drew a questionable inference from all the evidence to find that two male individuals were responsible for the crime. From the circumstantial evidence at trial an inference that only one person committed the crime is just as consistent as an inference that two persons were involved.

Bear in mind, Bonnie Boone, whom the prosecuting attorney presented as a reliable witness, *heard absolutely no sounds from the apartment above her,* after she saw *a shadow* walk by when she closed her bedroom window, while she was in bed and still awake. According to the evidence presented at the trial, she was about to doze off when she heard a thud on the floor of the apartment above her about 11 o'clock p.m.

The jury, having made a finding by inference that two male individuals committed the crime, was then required to identify the second male individual.

There is no direct evidence that two individuals committed the crime, and there is no direct evidence as to whom the second individual, if any, may have been.

To identify the second male individual, other than Jordan, the jury was required to stack an impermissible inference on the first inference. The circumstantial evidence asserted by the State in its motion for rehearing to support its theory of guilt, which involves the stacking of inferences, is enumerated by the State as follows:

"(1) Seminal fluid containing spermatozoa, the male reproductive cell, was found on the bedspread upon which the victim was found.

"(2) This seminal stain came from a male who has type-A blood who also secretes his blood type in his body fluids.

"(3) This seminal stain, therefore, could not have come from Allen Jordan who has type-O blood and secretes such blood type in his bodily fluids.

"(4) Nor could this seminal stain come from the victim's boy friend, Michael Roger, who has type-O blood and secretes such blood type in his bodily fluids.

"(5) That the only other individual shown to have authorization to use the bedroom where the seminal stained bedspread was found was the victim, Kay L. Robinson, a female who could not have produced a seminal stain containing spermatozoa.

"(6) That no other human being had access to that bedroom or bedspread since the last time that the bedspread had been cleaned except the perpetrators of the crimes against the victim.

"(7) That the seminal stain, therefore, was not on the bedspread prior to such attack because the washing of an item with blood substances upon it will remove

not only the stain (even blood) but the chemist's ability to determine a blood type for such evidence.

"(8) Therefore, the presence of the A blood type seminal fluid containing spermatozoa proves beyond a reasonable doubt that Allen Jordan must have had an accomplice inside the bedroom in which the victim was raped and killed."

### The State then argues in its motion for rehearing:

"The other evidence at the trial limits the possible suspects who assisted Jordan down to one individual when the evidence is viewed in a light most favorable to the prosecution and in giving full play to the right of the jury to weigh the evidence, and draw justifiable inferences of fact therefrom:

"(1) From the analysis above, the identity of Jordan's accomplice can be narrowed as follows:

"(a) Jordan's accomplice must have been a male (thereby eliminating all females as suspects);

"(b) That this male must have A-type blood (eliminating 59% of the population of males);

"(c) That this A-type blood male must also be a secretor (which limits the A-type blood group males by another 20%);

"(d) That this A-type blood secretor must have been with Allen Jordan in the bedroom of Michael Roger's apartment during the commission of these offenses on May 8, 1979.

"(2) The ability of Jordan obtaining an accomplice other than the appellant for this offense who would nevertheless match the above known characteristics is so small as to speculate into the realm of unreasonable possibilities due to the facts and circumstances surrounding these offenses."

Most of the above numbered statements made by the State in its motion for rehearing are either inferences based upon inferences or conclusions drawn from those inferences. From the evidence presented at the trial the conclusion stated in enumerated item No. (8) above is unwarranted.

Eileen Burnau, a criminalist with the Kansas Bureau of Investigation, primarily interested in the area of forensic serology, was presented by the State as its expert on the examination and identification of blood and other body fluids usually found in a stained or crusted form. She examined the sheets and the blue bedspread taken from the bed upon which the victim was found in Roger's apartment on the night of May 8, 1979. She testified:

"Q.  And what did you do with these items on receiving them?

"A.  Upon receiving these particular items I first collected any hair that might be present on all three items and then I did an examination to determine if, first of all if blood was present and the type on all three items and then I did an examination to determine if seminal fluid was present, and on the seminal fluid that was found I did a determination to see if I could do an ABO Grouping on that.

"Q. Starting then with the blue bedspread, State's Exhibit No. 33, what if anything did you find?

"A. On State's Exhibit No. 33, which is the blue bedspread, I detected human blood, Group O. I detected seminal fluid containing spermatozoa, the male reproductive cells. On these seminal stains I detected blood group substances A and H.

"Q. And what if anything were you able to determine about the individual or individuals from whom those blood groups were found from your findings on the blue bedspread, No. 33?

"A. As I stated, the blood came from an individual who was blood type O. The seminal stains, assuming it came from one individual, came from someone— would be consistent with someone who is a type A secreter. Eighty per cent of the general population are known to be secreters. That means that they secrete their ABO blood type in their body fluids, which includes saliva, seminal fluids and vaginal secretions, and in that particular stain, which is a seminal fluid stain, I detected blood substances A and H, and that would be consistent with a person who is a type A individual and does secrete the blood type in the other body fluids.

"Q. Going next then to the top sheet labeled as State's Exhibit No. 34, what if anything did you find in your examination of that item?

"A. On State's Exhibit No. 34, I again detected human blood group O. On some of the stains on the top sheet I detected seminal fluid containing spermatozoa, the male reproductive cells. I did the ABO grouping on the seminal stain but my results were inconclusive.

"Q. Then going to the next item, State's Exhibit No. 35 for identification purposes which is the bottom sheet.

"A. On the bottom sheet I detected human blood group O and I did not detect any seminal fluid."

On cross-examination Eileen Burnau testified in answer to questions:

"Q. . . . My question is relating to the time sequence of the material that you obtain for testing from the cloth at the location where this semen stain was found. Did you make any time tests to determine when any of the elements that you found there could have been deposited?

"A. If you are talking about when the seminal stain—

"Q. No, I am talking about when you made—whether you made any tests to determine why anything and everything there was put on there at the same time.

"A. There are no tests available to make that determination.

"Q. So far as you know.

"A. Yes.

"Q. So you could not separate and say that the substance A, which you found at that location and the substance H, which was found at that location, were deposited on the bedspread at the same time?

"A. That is correct.

"Q. So you do not know for a fact and you don't infer that those two substances had to come from the same individual, do you?

"A. That is correct. If I might repeat what you said.

"Q. If you will answer my questions we will get along real fine. If you have

some explanation, Mr. Gorup is going to give you an opportunity to give you that chance. Now, you used the word 'consistent.' Now, when you say that the findings of substance A and H on that bedspread at the location of that semen stain is consistent with it being deposited by a person who is a secreter because substance A and H are present in a secreter, is it not true that it is consistent with a male O, H substance, a female A, since we didn't separate it out, a female O and also having a later deposit of A by some male and isn't it also consistent with a deposit of anybody—anybody's secretions from a secreter who had either A or O and the spermatozoa—semen from a secreter of either A or O, aren't those still consistent?

"A.   Yes —"

On further cross-examination she testified:

"A.   I am afraid I am not qualified as a chemist and I probably should not answer that question.

"Q.   So you don't claim to be a chemist?

"A.   That is correct."

The nebulous character of the foregoing testimony established, among other things, that no tests were available to determine the age of seminal stains, and that tests made of seminal stains do not identify an individual.

In *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981), Eileen Burnau came up with a calculated blood analysis of 6/10ths of 1% of the population under the Multi-System polymorphic enzyme analysis to narrow the identification of the possible suspects in a murder case. There the court held any challenge to the reliability of the testing went to its weight, not its admissibility.

In the instant case Eileen Burnau's analysis narrowed the field of possible suspects to 32.8% of the male population based on her A-B-O blood grouping analysis, assuming the jury adopted the State's theory and did not find the credibility of her testimony shaken on cross-examination.

Mike Roger, in whose apartment the victim was found, testified that his wife had filed an action for divorce against him on April 19, 1979, which was only nineteen days prior to the victim's death. His testimony established that he had been having sexual relations with the victim. According to Roger the last time he had sex with Kay was on Sunday, May 6, 1979, in Oklahoma; the last time he had sex with Kay on the bed in the apartment was estimated about two weeks before her death; and the last time he had sex with Kay in the apartment was on April 30, 1979, in the front room. He further testified Kay would clean the apartment

and usually make the bed up. He said: "That is why she would come over while I was at work or after she got off work and clean the apartment." Roger related that on May 8, 1979, Kay was at his apartment in the afternoon and left for work at 3:15 p.m. He testified:

"Q. When was the last time that you are aware of personally that that bedspread and linen was on that bed got cleaned before Kay's death?
"A. Sunday, the Sunday before.
"Q. Now, were both the linen and the bedspread washed the same day?
"A. The sheets were washed that Sunday and the bedspread was washed the week—one week before that."

Mike Roger testified that the victim had a key to his apartment, also that he "had one and the landlord."

The landlord of Mike Roger, John Plummer, a prosecution witness, testified he gave a key to the apartment to Mike Roger and his wife and that he kept two keys for himself. He acknowledged that the key could have been duplicated.

Mike Roger testified he left the apartment for work at the Boeing Company in Wichita on May 8, 1979, at 3:45 p.m. His shift at Boeing began at 4:30 p.m. and ended at 1:00 a.m. He had regular employment at Boeing on the night shift. Roger said he tried to call Kay at his apartment at 11:00 p.m. on May 8, 1979, but no one answered the telephone.

Brenda Dryden, age eighteen, was a prosecution witness who described herself as a friend of Kay Robinson. Besides seeing Kay in school she socialized with her. Brenda worked at the Kentucky Fried Chicken restaurant and saw Kay on the afternoon of May 8, 1979, when Kay invited her (Brenda) to come to Mike Roger's apartment that night. Brenda got off work a little after 10:00 p.m., but was tired and went home without calling Kay to tell her that she was not coming to Roger's apartment. Brenda testified on cross-examination:

"Q. Had you ever met Kay at Mr. Roger's apartment before?
"A. Yes, I have.
"Q. And so is there any particular reason—Did she tell you any particular reason she was selecting Mike Roger's apartment for you to meet that evening?
"A. Because she—Because she had been over there and we would go over there and just listen to stereo.
"Q. She didn't explain that either, just said, meet me at Mike's, is —
"A. That is essentially what she said, right."

While the State contends that Kay L. Robinson was the only

other individual shown to have "authorization to use the bedroom where the seminal stained bedspread was found," the evidence presented from prosecution witnesses was that two girls working at different restaurants, who were seniors in the Augusta High School and socialized together, were using Mike Roger's apartment at night while Roger was working on the night shift at Boeing.

On the foregoing evidence the State's attempt to zero in on a deposit of semen to establish *beyond a reasonable doubt* that the appellant, Douglas L. Williams, assisted Jordan as an accomplice inside the bedroom of Mike Roger's apartment, where the victim was raped and killed, requires the stacking of too many inferences to warrant approval by this court. On the record presented in this case, the State is required to rely on circumstances which are inferred or presumed from other circumstances. This fails to meet the burden of proof cast upon the State in a criminal prosecution to prove guilt beyond a reasonable doubt.

The State's attempt to bolster its case by elaborating on Jordan's ability to recruit an accomplice, other than the appellant, is likewise subject to the infirmity that the State relies on circumstances which are inferred or presumed from other circumstances.

Another bit of circumstantial evidence that warrants further attention is the empty package of Marlboro Light 100's found in the trash bag on the rear seat in the appellant's sister's car two days after the crime. This empty package was found to have a fingerprint of the appellant on it. No prints identifiable as the victim's were found on the empty package. This empty package was marked as an exhibit and bore a tag placed on it by the investigating officer which read: "Found in Jordan's trash."

In its motion for rehearing in this case the State charges the court on this matter with reweighing the evidence by its reference in the opinion to statements made by defense witnesses at the trial. The summary disposition of this bit of circumstantial evidence in the opinion was perhaps misleading. In substance, the court in reviewing the evidence simply determined the jury could not draw a *justifiable inference* from this circumstance to establish the appellant's participation in the crimes charged.

Evidence at the trial disclosed that Deanna Williams, an employee at the Derby self-service gas station in Augusta on the

night of May 8, 1979, sold *a pack of cigarettes* to Kay L. Robinson, whom she had known as a schoolmate. In her testimony at the trial she said it was "Some kind of Marlboros." When pressed to give the brand name she said: "It was either Marlboro Lights or Marlboro Light 100's. I don't know for sure." Randy Smith, a special agent for the Kansas Bureau of Investigation, interviewed Deanna Williams shortly after the homicide and was called to testify concerning the sale of cigarettes by Deanna Williams to Kay Robinson. Smith testified (without objection by defense counsel):

"Q. Did she indicate to you at that time what brand of cigarettes Kay Robinson bought?

"A. Yes. She was almost certain in her mind that the victim purchased Marlboro Light 100's at the time of the interview, but —

"Q. Back then on the 26th she still qualified her answers then, she didn't say she was positive they were Marlboro Lights?

"A. No, she wasn't positive. She believed—she was almost sure."

Assuming the jury found Kay L. Robinson purchased one package of Marlboro Light 100's on the night of May 8, 1979, on the way to Roger's apartment, the direct evidence discloses when the police examined her purse at the crime scene they found *one partial package of Marlboro Light 100's* containing nine cigarettes.

For the jury to make anything of the circumstance that an empty package of Marlboro Light 100's was found in Jordan's trash two days after the crime in the car of the appellant's sister (Jordan's live-in girl friend) bearing the appellant's fingerprint, it was required to draw *an inference* that Kay L. Robinson on the night of May 8, 1979, went to Roger's apartment with *two packages* of cigarettes that were Marlboro Light 100's in her purse. Assuming this to be a proper inference, then who took the second package? It was found in Jordan's trash. He was known to have been in Roger's apartment on the night in question. Did Jordan smoke the cigarettes and discard the empty package in the car to which both Jordan and the appellant had access? Did the appellant then pick up the empty package from somewhere in the car and put it in the trash bag on the rear seat? Did the appellant smoke a pack of Marlboro Light 100's procured from some other source, as indicated by possibilities in the court's opinion? Many other possibilities can be imagined. This is not to suggest the court is reweighing the evidence, but to emphasize that the jury

was required to draw a *second inference* based upon the first inference to find the appellant was in the apartment of Roger when the crime was committed and took a package of Marlboro Light 100's from the victim's purse. This is not a justifiable inference the jury can make from the circumstantial evidence. If the jury based its conviction on this circumstantial evidence, it was based upon pure speculation and conjecture, and the conviction cannot be upheld.

The State contends the intent of the appellant to commit the crime can be shown by the crime itself. From the transcript of the evidence there is no evidence upon which a jury could draw a *justifiable inference* that the appellant participated in any way in these crimes. Neither seminal stain nor any other evidence could be used to make identification, and the crime scene cannot be used to establish the intent of someone who is not shown to have been connected with the crime. Mere association with Jordan, the principal who actually committed these crimes, or mere presence of the appellant in the vicinity of the crime scene is insufficient to establish guilt of the appellant as an aider or abettor. What the law requires to show guilt of one who aids and abets is that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture. *State v. McDaniel & Owens,* 228 Kan. 172, 612 P.2d 1231 (1980).

The State in its motion for rehearing charges the court with explaining away certain incriminating evidence by accepting defense testimony which the jury had the right to reject. On this point the State asserts what it describes as contradictory statements made by the appellant. The substance of the statements made by the appellant to the investigating officers before and after his arrest are stated in the court's opinion. The State argues the appellant in his second interview "provided authorities with information so important and obvious in a murder investigation (of which he was fully aware during his first interview) that nondisclosure of such information coupled with his affirmative statements to the contrary, clearly establish evidence of a guilty mind attempting to conceal the involvement of either Jordan or himself in these offenses."

At the trial the appellant testified:

"Q. And would you continue on and tell us what happened?

"A. Well, it was approximately 10:00 o'clock when headlights pulled up in the driveway. Allen went to the window and stated that it was Mike's girlfriend and that he was going downstairs to see what time Mike would get home.

"Q. Did he tell you why?

"A. He said he wanted to see if Mike had a joint.

"Q. Then what happened.

"A. The baby was crying in the bedroom.

"Q. The baby?

"A. Heather.

"Q. All right. When you talk about some other person please identify because as with your mother's testimony, we have a difficult time when you use pronouns for descriptions.

"A. Okay. I went and got her to the bathroom to clean her up. She was wet so I thought I would give her a bath and make her sleep better, and Allen came back up and came into the bathroom. We talked about 10 minutes or 15 minutes.

"Q. Continue.

"A. And he went into the living room while I was in the bathroom and he stated that he was going next door, that he would be back in a minute. So I finished with Heather.

"Q. Did he say anything at that time?

"A. No, that is all he said. I finished with Heather, put her to bed, went back to the living room, watched T-V for awhile and fell asleep on the couch.

"Q. Now, Doug, are there any clocks or watches in your apartment?

"A. No.

"Q. And when you related these times it is a pure guesstimate; isn't it?

"A. Yes.

"Q. Do you recall later being awakened?

"A. Yes. My girl friend at the time, Becky Young woke me up. I was asleep on the couch. She woke me up when she arrived home.

"Q. And did you—Do you have an estimate as to the time that was?

"A. I would estimate it somewhere between 11:30 and 12:00 o'clock.

"Q. Now, you don't know what Allen Jordan then—at the time he was out of your presence, do you?

"A. That is correct.

"Q. Doug, did you kill Kay Robinson?

"A. No sir, I didn't.

"MR. WATKINS: You may cross-examine.

"CROSS EXAMINATION

"BY MR. GORUP:

"Q. Doug, what makes you think that Kay got home around 10:00 o'clock?

"A. That—Like I said, that is approximate.

"Q. Do you remember telling the officers of the KBI in the conversation with them on May 9, 1979, that you were able to tell what time Kay got home because Starsky and Hutch was just going off the air or words to that effect?

"A. I recall something to that effect.

"Q. And you wouldn't lie to the officers, would you?

"A. No.

"Q. And you wouldn't—So that was the truth?

"A. I just estimated the time. I related it to the show Starsky and Hutch going off the air at the time and the headlights came into the drive. It was either off or going off, yes.

"Q. Now, at the time you talked to the officers on May 9, you know they were talking to you about a girl that was dead in the apartment next door?

"A. Yes.

"Q. And as you testified today, Allen had told you that night that he was going over there. He had left the apartment twice in fact, did he not? Did he not?

"A. Yes, but he just stated he was going next door.

"Q. He didn't say anything about the girl?

"A. When he was in the bathroom he made a comment, yes.

. . . . .

"Q. Do you remember telling officers on May 11, 1979, that Allen told you words to the effect that that girl next door was good looking and he wanted to get into her pants?

"A. Yes, but that was when we was in the bathroom not when he was —

. . . . .

"Q. Did you volunteer that information to the officer on May 9?

"A. Not at the time, no.

"Q. You knew it was important, didn't you?

"A. I had forgot all about it.

"Q. But since that date you remember it, is that true?

"A. Yes."

As heretofore stated the trial court at the close of the State's evidence granted a motion for judgment of acquittal on the charge of aiding a felon.

The trial court properly instructed the jury that it had the right to determine the weight and credit to be given the testimony of each witness. Under the instruction the jury had the right to reject the testimony of any witness or the testimony of the appellant.

According to the appellant's testimony he was in his apartment for the entire period of time in question on the night of May 8, 1979. While the jury had the absolute right to reject the appellant's testimony, the jury had no authority by reason of its disbelief of the appellant's testimony to consider the converse of the appellant's testimony as affirmative evidence against him and base a conviction thereon. In other words, the jury could not find the appellant was in the apartment of Mike Roger assisting Jordan on the night in question, that he entered the apartment unlawfully with intent to rape, or that he participated in the crimes from testimony given by the appellant at the trial or from statements that he made prior to trial. The appellant made no admissions suggesting guilt on his part for any of the offenses with which he was charged. Under our theory of criminal jurisprudence in this

nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State.

Our review of the transcript in this case, which is the record of the trial as transcribed by the court reporter from notes taken at the trial recording the verbatim testimony of all witnesses and proceedings before the trial court, discloses the jury's verdict finding the appellant guilty of aggravated burglary and felony murder was based on pure speculation and conjecture. The State utterly failed to prove the appellant's guilt beyond a reasonable doubt.

It is apparent the jury had difficulty with the evidence and the instructions. The jury acquitted the appellant of rape, yet it had to find under the court's instruction that the appellant entered the apartment of Mike Roger on the night in question without authority and *with intent to commit rape* to find him guilty of aggravated burglary. Logically, if the State's theory of guilt was adopted by the jury, the appellant was an accomplice assisting Jordan in the crimes of rape and felony murder, and under the instruction on aiding and abetting the jury would have found the appellant guilty of rape just as they did Jordan, the principal actor.

The appellant's conviction has been reversed by the court's opinion filed February 28, 1981. The lower court is directed to discharge the appellant forthwith.