(649 P.2d 409)
No. 53,266

STATE OF KANSAS, *Appellee,* v. DAVID W. DAVIS and DEBRA L. DAVIS, *Appellants.*

Opinion filed August 5, 1982.

*Daniel E. Monnat,* of Shultz, Fisher, Monnat & Shultz, of Wichita, for the appellants.

*Chris Senseman,* assistant district attorney, *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, for the appellee.

Before FOTH, C.J., REES and MEYER, JJ.

FOTH, C.J.: In a joint trial a Sedgwick County jury convicted the defendants, husband and wife, of possession of marijuana with the intent to sell (K.S.A. 65-4105, 65-4127b[b][3]). The couple's prosecution stemmed from a July, 1980 search of their residence on South Sheridan Street pursuant to a warrant. The

search uncovered large quantities of marijuana which were introduced at trial after defendants' motion to suppress was overruled.

The controlling issue on appeal is whether the affidavit in support of the warrant obtained to effectuate this search demonstrated probable cause. The affidavit, which was the only evidence presented to the issuing magistrate, is as follows:

"Affiant, DUFFY DOYLE, is a Detective with the WICHITA POLICE DEPARTMENT assigned to the NARCOTICS SECTION. In that capacity Affiant met with an individual named "VANCE", at the corner of SENECA and DALLAS, WICHITA, KANSAS, in the evening of July 22, 1980. VANCE told Affiant his (VANCE'S) source had the hash Affiant had inquired about. VANCE and Affiant got in VANCE'S car and drove to an individual, who VANCE stated was his source. They went to the front of a residence at 2351 SOUTH OSAGE, WICHITA, KANSAS. Affiant gave VANCE $110.00, for an ounce of hashish (marihuana). VANCE acted surprised and stated he thought Affiant was purchasing a pound of hashish for $1,200.00. VANCE went into the residence at 2351 SOUTH OSAGE, WICHITA, KANSAS, to see if his source would sell just an ounce. A few minutes later, VANCE came out and said his source was very upset, because he thought it was going to be a pound deal and now VANCE'S source would have to return the pound of hash to his source (VANCE'S source) [sic]. VANCE stated his source had wanted to get the deal over quickly, because his source wanted to settle down with a girl. Affiant inquired if they could do the pound deal later that night and VANCE stated that unless Affiant could get the money together within fifteen minutes his (VANCE'S) source would return the hash to his (VANCE'S source's) source.

"Affiant spoke with LT. GARY FULTON, Night Supervisor, with the WICHITA POLICE DEPARTMENT NARCOTICS SECTIONS, who told Affiant, that when Affiant and VANCE left 2351 SOUTH OSAGE, WICHITA, KANSAS, surveillance was continued at that address. Surveillance was conducted by DETECTIVES BREWER, TRAINER, HERBEL and the WICHITA POLICE DEPARTMENT HELICOPTER, OFFICER STEELE. LT. FULTON told Affiant that within several minutes after Affiant left the address (2351 SOUTH OSAGE, WICHITA, KANSAS), a white male exited the residence and drove directly to 418 SOUTH SHERIDAN, WICHITA, SEDGWICK COUNTY, KANSAS. The male went into that residence, was inside a few minutes and returned to his car; and then drove directly to 2351 SOUTH OSAGE. LT. FULTON advised Affiant the male stopped at no place other than 418 SOUTH SHERIDAN, WICHITA, KANSAS, and had contact with no individuals while enroute to and from that residence. LT. FULTON stated he knows the above to be true, because he aided in the surveillance and monitored communications of the surveillance officers. Meanwhile, VANCE took Affiant back to the intersection of SENECA and DALLAS. VANCE told Affiant he would see what he could do about setting the deal up later. VANCE then left the area. Within five minutes, VANCE returned and stated it was too late, that his source had already left.

"Affiant spoke with LT. FULTON, who told Affiant, he checked with the WICHITA POLICE DEPARTMENT RECORDS SECTION, and this revealed

WICHITA POLICE DEPARTMENT RECORDS indicate DAVID W. DAVIS resides at 418 SOUTH SHERIDAN, WICHITA, SEDGWICK COUNTY, KANSAS.

"Affiant examined a copy of the NATIONAL CRIME INFORMATION CENTER RECORDS on DAVID W. DAVIS, which indicates DAVIS was arrested for Possession with intent to Sell Marihuana and Conspiracy to Sell Marihuana on June 20, 1974.

"Affiant was told by Assistant District Attorney, DOUGLAS R. ROTH, that he (ROTH) examined the District Attorney's files, in regards to the above arrest. ROTH stated DAVIS was arrested and charged with Possession of Marihuana and Conspiracy to Sell 60 pounds of Marihuana, but the case was dismissed by the State, when the Court would not admit hearsay testimony of co-conspirators.

"Affiant looked in the Cross Reference Directory for WICHITA, KANSAS, and the directory indicates DAVID W. DAVIS resides at 418 SOUTH SHERIDAN, WICHITA, KANSAS.

"DETECTIVE BREWER told Affiant, he (BREWER) was one of the surveillance Officers and he saw 418 SOUTH SHERIDAN, WICHITA, SEDGWICK COUNTY, KANSAS, and it was a white, single story, single family dwelling.

"FURTHER AFFIANT SAITH NOT."

In *State v. Hart,* 200 Kan. 153, Syl. ¶¶ 10 and 11, 434 P.2d 999 (1967), the court restated the principles controlling the issuance of search warrants, and particularly those based on hearsay:

"It is essential to the validity of a search warrant that the issuing magistrate be provided with sufficient facts to enable him to make an intelligent and independent judgment that probable cause for its issuance exists; bald conclusions or mere affirmations of belief or suspicion are not enough."

"While an affidavit may be based on hearsay, there must be adequate affirmative allegation of the affiant's personal knowledge of facts or of his informant's reliability, or as to the informant's personal knowledge of the information provided, to provide a rational basis upon which the issuing magistrate can make a judicious finding of probable cause."

Those principles are consistent with, although perhaps not as explicit as, the leading cases of *Aguilar v. Texas,* 378 U.S. 108, 12 L.Ed.2d 723, 84 S.Ct. 1509 (1964), and *Spinelli v. United States,* 393 U.S. 410, 21 L.Ed.2d 637, 89 S.Ct. 584 (1969). While an affidavit in support of a search warrant may be based on hearsay, *State v. Williams,* 229 Kan. 290, 623 P.2d 1334 (1981); *State v. Boster,* 4 Kan. App. 2d 355, 606 P.2d 1035 (1980), there must be "adequate affirmative allegations to supply a rational basis on which a finding of probable cause can be based." *State v. Wheeler,* 215 Kan. 94, Syl. ¶ 5, 523 P.2d 722 (1974). Similar in language, *Jones v. United States,* 362 U.S. 257, 4 L.Ed.2d 697, 80 S.Ct. 725 (1960), requires, before hearsay may serve as a basis for a warrant, the State show "a substantial basis for crediting the

hearsay." 362 U.S. at 269. It is the tests enunciated in *Aguilar* and *Spinelli* which tell us when a "substantial basis" or a "rational basis" exists.

Without the hearsay the affidavit showed only two things:

1. An unidentified man left a residence at 2351 South Osage street and proceeded to 418 South Sheridan. Wichita police records indicated David Davis lived at the South Sheridan address and this was confirmed by a cross-reference directory. The man went inside the South Sheridan residence for a few minutes, came out to his car and drove back to 2351 South Osage.

2. National crime records indicated David Davis was arrested for possession with intent to sell marijuana and conspiracy to sell marijuana on June 20, 1974. The case was dismissed when the court would not admit hearsay testimony of co-conspirators.

Obviously, the above two showings do not amount to probable cause to search the residence at 418 South Sheridan for narcotics. Without the hearsay contained in the affidavit, the State's warrant could not have been issued.

Accordingly we must decide whether the hearsay satisfies *Aguilar-Spinelli* standards. The court in *Aguilar* announced the "two-pronged" test which governs here.

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.'" 378 U.S. at 114.

The two elements of the *Aguilar* test are generally referred to as the "basis of knowledge" test and the "veracity" test. The "basis of knowledge" prong concerns *how* a police informer knew what he claimed to know. The "veracity" prong deals with either "credibility" or "reliability." "Credibility" means the informer's reputation and history of honesty; "reliability" means circumstances or events which verify the informant's conclusions. The State must therefore establish (1) the basis of the informer's knowledge and (2) his veracity, by showing *either* (a) the informer's credibility *or* (b) the reliability of the information.

Before proceeding we are met with the State's argument, apparently accepted by the trial court, that the *Aguilar-Spinelli* tests do not apply because "Vance" was not a police informer. In

effect, the trial court bestowed upon "Vance" the status of a law abiding citizen-informer simply because he is "named" in the affidavit. The court remarked at the close of the suppression hearing:

"I've never found anywhere where the Supreme Court has said that if you name John Doe, a citizen, has told us something, that you have to prove that John Doe is reliable. He is not a confidential informant or he wouldn't be named in the affidavit."

It is true Kansas recognizes the difference between a paid informant and the disinterested citizen witness or victim. See *State v. Hays,* 221 Kan. 126, 557 P.2d 1275 (1976); *State v. Lamb,* 209 Kan. 453, 497 P.2d 275 (1972). Many cases from other jurisdictions hold the disinterested citizen merits presumptive validity on the veracity prong. See *State v. Ybanez,* 210 Neb. 42, 313 N.W.2d 30 (1981); *Mauldin v. State,* 402 So. 2d 1106 (Ala. App. 1981); *People v. Ball,* _____ Colo. _____, 639 P.2d 1078 (1982); *People v. Press,* 633 P.2d 489 (Colo. App. 1981); *Davis v. State,* 159 Ga. App. 356, 283 S.E.2d 286 (1981). See also LaFave, Search and Seizure § 3.4 (1978).

However, from the affidavit it is obvious "Vance" was not a disinterested citizen informer or victim of a crime, but a participant and middleman in an illegal drug transaction. He was not even named in the affidavit in such a way as to be identifiable. Only a nickname was given, with no further description. Assuming "Vance" to have been a disinterested informer, the State did not affirmatively allege this status or make it self-evident from the facts included in the affidavit. In addition, as one scholar puts it:

"It does not follow . . . that if the name of the person providing the information *is* disclosed, then he is by virtue of that fact alone properly characterized as a citizen-informer entitled to the presumption of reliability. 'That a person is named is not alone sufficient grounds on which to credit an informer, but it is one factor which may be weighed in determining the sufficiency of an affidavit.' Thus, if the person giving the information to the police is identified by name but it appears that this person was a participant in the crime under investigation or has been implicated in another crime and is acting in the hope of gaining leniency, then the more strict rules regarding the showing of veracity applicable to an informer from the criminal milieu must be followed." LaFave, Search and Seizure § 3.4, pp. 599-600.

From the circumstances surrounding this arranged buy the State could not have elevated "Vance" to citizen informer status.

Further, hearsay from a citizen informer must still pass the *Aguilar-Spinelli* tests, though the veracity prong will be less difficult to establish.

We turn now to the two "prongs" enunciated in *Aguilar* and *Spinelli*. The first, *i.e.,* the "basis of knowledge" prong, demonstrates to the magistrate how the informant reached his conclusions. The magistrate thus confirms the fact the informer did not obtain his information from the shadowy circles of the underworld or unconfirmed rumor. Judge Moylan, who authored *Thompson v. State,* 16 Md. App. 560, 298 A.2d 458 (1973), a case relied on by the State to show informational reliability, has written elsewhere on this point:

> "The 'basis of knowledge' test presents no conceptual difficulties. It is not concerned one whit with an informant's honesty or 'veracity.' It is concerned, rather, with conclusionary validity. Even assuming 'credibility' amounting to sainthood, the judge still may not accept the bare conclusion of a sworn and known and trusted police-affiant. To do so would be an unconstitutional delegation of the decision-making function which the fourth amendment lodges exclusively in the judge himself. The concurring opinion of Justice White in *Spinelli* put the question succinctly:
>
>> " '[D]id the information come from observation, or did the informant in turn receive it from another? Absent additional facts for believing the informant's report, his assertion stands no better than the oath of the officer to the same effect. Indeed, if the affidavit of an officer, known by the magistrate to be honest and experienced, stating that gambling equipment is located in a certain building is unacceptable, it would be quixotic if a similar statement from an honest informant were found to furnish probable cause.'
>
> "The 'basis of knowledge' prong assumes an informant's 'veracity,' and then proceeds to probe and test his conclusion: ('What are the raw facts upon which the informant based *his* conclusion?' 'How did the informant obtain those facts?' 'What precisely did he see or hear or smell or touch firsthand?' 'If he heard the facts from someone else, what makes that third person "credible" and how did that third person come by the knowledge?'). The judge must ascertain the source for the raw data — the product of someone's senses — and then weigh that data for himself. He is concerned not with that part of an affidavit or testimony which provides information *about* the informant but with the recitation of the story coming *from* the informant." Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L. Rev. 741, 773 (1974).

The State, to satisfy this prong, relies on the exception formulated in *Spinelli.* There a "reliable informant" told the F.B.I. the defendant was running a handbook and accepting wagers in a bookmaking operation using telephones with certain assigned numbers out of a St. Louis apartment. The Supreme Court explained the defect in the first "prong" and offered one solution by

referring to *Draper v. United States,* 358 U.S. 307, 3 L.Ed.2d 327, 79 S.Ct. 329 (1959).

"Perhaps even more important is the fact that *Aguilar's* other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. *We are not told how the FBI's source received his information — it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable.* Cf. *Jaben v. United States,* 381 U.S. 214, [14 L.Ed.2d 345, 85 S.Ct. 1365] (1965). *In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Spinelli,* 393 U.S. at 416. Emphasis added.

In *Draper,* an informant with his credibility well established (paid special employee who had supplied reliable information for six months) told authorities (1) the defendant would return to Denver by train on a certain date (2) would be a Negro with light brown complexion (3) would be 5'8" and weigh 160 pounds (4) would be 27 years old (5) would be wearing a light-colored raincoat with brown slacks and black shoes (6) would carry a tan zipper bag and (7) would walk quickly. The minuteness of the detail allowed the magistrate to "infer that the informant had *gained* his information in a reliable way." *Spinelli,* 393 U.S. at 417. Emphasis added.

The State concedes nothing in the affidavit confirms "Vance" personally conversed with his source but argues "Vance" spoke with sufficient detail for the issuing judge to infer he actually spoke with his source.

The State relies on the following circumstances to sustain an inference that "Vance" had actually talked to a "source" of hashish. "Vance" said his source was upset and wanted to settle down with a girl; "Vance" said his source would return the hash if a full pound deal was not consummated in the next fifteen minutes; and "Vance" also knew his source was gone within five minutes after the pair had returned to their initial meeting place and "Vance" relayed this information after leaving momentarily.

There are major differences between this case and *Draper.* "Vance" does not benefit from the admitted veracity of the informer in *Draper,* nor does his information display the "minute

particularity" spoken of in *Spinelli* by reference to *Draper.* 393 U.S. at 417. What the affidavit recites is *conclusions* from an alleged conversation; it does not relate detail sufficient to confirm that these conclusions resulted from Vance's personal observation. For all we know, "Vance" could have learned of the source's displeasure or his early departure from a third person, or "Vance" could have easily concocted the whole story. How "Vance" learned of the position taken by his alleged source remains a mystery. There is in addition a complete lack of sufficient detail to show *how* the ultimate conclusion that *Vance's source even had a source* was reached. In short, there is nothing in the affidavit to show how Vance came by the information he related, and hence a complete failure to meet the "basis of knowledge" prong of the test.

The "veracity" prong can be satisfied in one of two ways — either by showing the credibility of the informant or by showing the reliability of the information itself. The State concedes nothing in the affidavit demonstrates "Vance's" credibility. This leaves the State with proving the information supplied was reliable, *i.e.,* cicumstances which indicate the truthfulness of the *information* as opposed to the informant himself. To satisfy the prong, the State relies on 1) statements against the declarant's penal interest, and, 2) the independent "verification" of the police surveillance.

The basis for the first ground comes from *United States v. Harris,* 403 U.S. 573, 29 L.Ed.2d 723, 91 S.Ct. 2075 (1971), where an informant told a federal tax investigator of his illegal buying of whiskey from the defendant over a two-year period of time. The court found, "The accusation by the informant was plainly a declaration against interest since it could readily warrant a prosecution and could sustain a conviction against the informant himself." 403 U.S. at 580. By giving this information he admitted "major elements of an offense under the Internal Revenue Code." 403 U.S. at 583.

The conversation here did not attain the status of admissions against penal interest when there is no showing "Vance" had any idea he was communicating with the police. This is in contrast to the admissions made by the declarant informer in *Harris* to the federal tax investigator. See *State v. Prince,* 227 Kan. 137, 146-47, 605 P.2d 563 (1980) (conversation between two prisoners in jail

who did not expect their conversation to be reported not a statement against penal interest). We also recognize those authorities which hold trustworthiness cannot be shown by a declaration against penal interest if the informant remains unidentified. See *Barber v. State,* 43 Md. App. 613, 406 A.2d 668 (1979), and cases cited therein.

To establish informational reliability the State principally relies on the nature of the transaction and the reasoning in *Thompson v. State,* 16 Md. App. 560. There a police officer learned of the existence of heroin through his primary informant who learned of the dealer's identity from a secondary informant whose credibility had not been established. It is important to note the credibility of the primary informant *had been stipulated to.* 16 Md. App. at 565. The opinion then discloses these facts and the solution establishing the unknown secondary informant's reliability:

"Officer Schline's informant was, or posed as, a narcotics addict and regular purchaser of narcotic drugs. During the late morning of December 22, he went to the 700 block of Newington Avenue to buy from his seller some drugs, which he intended to pass on to Officer Schline. This unidentified seller, who is the secondary informant now under analysis, informed his purchaser that he did not then have any drugs to sell. He urged his purchaser to return at around 1 p.m. He indicated that he would then have drugs to sell 'when Guy made the drop.' A 'drop' is a recognized term in the jargon of the junkie for a delivery of drugs by an upperechelon distributor to a street dealer.

"From his own knowledge, the primary informant — Officer Schline's regular informer — was able to specify that 'Guy' was the appellant Guy Thompson and that he would be driving a 1965 Pontiac with Maryland tag number FG 5147. The primary informant's own information, however, went only to the identity of 'Guy' and not to his anticipated criminal activity at or about 1 p.m. on December 22. That information came only from the more remote, secondary informant. With respect to that secondary informant, it is agreed that he spoke from firsthand knowledge. *Aguilar's* 'basis of knowledge' prong is not in issue. Our single problem is to measure this secondary informant — this unnamed street seller — against *Aguilar's* 'veracity' prong. Was there reason to believe that he was 'credible' or that his information was 'reliable?'

"In terms of our now classical mode of measuring an informant by the credibility aspect of *Aguilar's* 'veracity' prong, this unnamed street seller could not pass the test. Officer Schline did not know who he was or anything at all about him. No information was furnished as to whether the street seller had ever passed on information before, which had turned out to be correct. His inherent credibility — his integrity — his status as a truth speaker — is a total and unrelieved mystery. This aspect of traditional Aguilarian analysis yields absolute zero.

"The 'veracity' prong of *Aguilar* is, however, significantly phrased in the disjunctive. Even knowing nothing about the inherent credibility of a source of

information, we may still ask, 'Was the information furnished under circumstances giving reasonable assurances of trustworthiness?' If so, the information is 'reliable,' notwithstanding the ignorance as to its source's credibility." 16 Md. App. at 565-66.

## The court concluded shortly thereafter:

"We believe a like reasoning to apply to the unnamed street seller at bar. Though from the criminal milieu, to be sure, he was not, wittingly at least, working with the police. He was not in the position of 'the common informant . . . hidden behind a cloak of anonymity' who more often than not 'is paid or provides information in exchange for immunity from prosecution for his own misdeeds.' *People v. Glaubman,* 485 P.2d 711, 716-717 (Colorado, 1971). This street seller was, so far as he knew, engaged in a purely commercial venture for his own profit. He was dealing with a regular and presumably valued customer. Being unable initially to satisfy his customer's demand, it was to his every advantage to assure the prompt return of that customer as soon as fresh merchandise was available for sale. He simply had no purpose in misleading his own clientele. The circumstances in which the seller passed on the information to a customer and confidant are replete, we think, with reasonable assurances of trustworthiness. Upon our constitutionally-mandated independent review, we believe the information furnished by this secondary informant to have been reliable, notwithstanding his utter lack of demonstrated credibility." 16 Md. App. at 567-68.

For a number of reasons this case differs significantly from the one at bar. As the defendants stress, the *Thompson* case dealt with an informant who admittedly was credible. The most removed seller, the secondary informant, likewise had a basis for the knowledge which he gave. At least in *Thompson* the ultimate hearsay declarant had one *Aguilar-Spinelli* prong as a given. Here the one making the secondary hearsay statements, *i.e.,* "Vance's" source, is an individual we know nothing about. We have no information about this "source" to satisfy his veracity other than his inculpatory statements allegedly made to "Vance." As for "Vance" we have no admitted credibility as in *Thompson;* "Vance" merely played the middleman role in the transaction. He didn't make the statements but only relayed what supposedly his source conveyed to him.

The State argues that, as in *Thompson,* this is a conversation between a criminal seller and a criminal buyer surrounded by "indicia of reliability." Not so. "Vance," the middleman, was *not a buyer* as in the case of the primary informer in *Thompson.* Even assuming "Vance" could be considered a party to this commercial transaction, the circumstances of this sale do not mirror the transaction in *Thompson.* No "urging" of a "regular and valued

customer" transpired. Instead, the source gave the buyer an ultimatum — come up with the cash for a pound in fifteen minutes or the deal would be off. Moreover, it was the officer who attempted to salvage the deal later that night. The very fact the supposed source left the house several minutes after "Vance" and the officer left the area could indicate the "source" had little desire to complete the sale or had his suspicions aroused. Likewise, from the affidavit nothing reveals "Vance" or the officer were "regular and valued customers" of the source. No facts indicate the relationship between "Vance" and his source or even "Vance" and the officer. The affidavit leaves unanswered whether "Vance" regularly served as a solicitor, buyer, or broker for his source or if Officer Doyle, the actual buyer, had purchased from the source before. No facts indicate if "Vance" simply favored Officer Doyle by telling about the opportunity to procure drugs or if an informer's working relationship existed between the two. Under these facts, we find the holding in *Thompson* not controlling.

As an alternative the State attempts to establish veracity by independent verification. Again, Judge Moylan aids our analysis.

"When the recitation going to 'veracity' falls short of *Aguilar's* threshold, further inquiry is not estopped. There is still the extrinsic route to the establishment of 'veracity.' Even where the internal evidence about the informant himself, or about the circumstances under which the information was furnished, fails to establish intrinsically personal 'credibility' or informational 'reliability,' external evidence, contained elsewhere in the application, may be examined to see what buttressing it provides. Independent police or other credible observations may tend to verify — to corroborate — the story as told by the informant. A direct showing that some of the story has been verified as true lends credence to the remaining unverified portions of the story and so may raise it above *Aguilar's* threshold. When the intrinsic evidence is inadequate to pass muster, *Spinelli* describes the buttressing technique:

"'If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration? . . .

"A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which — even when partially corroborated — is not as reliable as one which passes *Aguilar's* requirements when standing alone.'"
25 Mercer L. Rev. at 777-78.

The activity observed by the police to verify what "Vance's" source indicated he would do, *i.e.*, return the hash to his own source, is a man leaving the residence and going to the South Sheridan address. We find the man leaving the first address verified little or nothing. The police had no description of "Vance's" source nor did they know how many individuals were present in the first residence. Nothing concrete in the affidavit would lead one to believe the hash would be returned to the residence *of the source* ("Vance's" source's source). The simple fact the man left only minutes after "Vance" and Officer Doyle departed contradicts the 15-minute waiting period afforded to the officer to come up with the extra money to buy a pound. Nothing the man carried corroborated the fact he was returning some of the merchandise to his source for he carried no package, bundle or container. There is no readily observable fact flowing from the short trip to and from the South Sheridan residence which would indicate that the man was "Vance's" source returning the hash to his source. In the words of *Spinelli* this is "innocent-seeming activity and data. Spinelli's travels to and from the apartment building and his entry into a particular apartment on one occasion could hardly be taken as bespeaking gambling activity." 393 U.S. at 414. As in *Spinelli,* this activity contains "no suggestion of criminal conduct when taken by [itself]  — and [it is] not endowed with an aura of suspicion by virtue of the informer's tip." 393 U.S. at 418. A tip when bolstered by corroboration must be as trustworthy as a tip which would meet *Aguilar's* standards standing by itself. *Spinelli,* 393 U.S. at 415-16. The affidavit also fails the "veracity" test.

To summarize, the primary deficiencies we perceive in the affidavit were these:

1.  "Vance" was not identified as either a "citizen" informer or a "reliable" informer. Hence his credibility was never established.

2.  He gave no information which could be independently verified in order that his statements might be taken as true even in the absence of established credibility on his part. In particular, there is no indication that the person travelling from the Osage Street residence to defendants' house on Sheridan was the person "Vance" alleged to be his source.

In view of these deficiencies there was nothing in the affidavit

to indicate that "Vance" was probably telling the truth or that there were probably drugs in defendants' residence. The six-year-old arrest record of Davis was entitled to *some* weight under *Harris,* 403 U.S. at 582. However, without attributing value to "Vance's" hearsay the old arrest record clearly did not establish probable cause to believe there were drugs in Davis's house six years later. *Cf. State v. Jacques,* 225 Kan. 38, Syl. ¶ 2, 587 P.2d 861 (1978); *State v. Morgan,* 222 Kan. 149, 563 P.2d 1056 (1977). As noted, the hearsay in the affidavit was valueless.

It follows the search warrant was improperly issued and its fruits were erroneously received at trial.

The convictions are reversed.