NOT DESIGNATED FOR PUBLICATION

No. 119,185

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADLEY EARL BENNETT,
*Appellant*.


MEMORANDUM OPINION


Appeal from Labette District Court; FRED W. JOHNSON JR., judge. Opinion filed August 30, 2019. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Stephen P. Jones*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., MALONE, J., and STEVEN E. JOHNSON, District Judge, assigned.


PER CURIAM: After a jury trial, Bradley Earl Bennett was found guilty of one count of burglary and one count of theft. Bennett directly appeals his convictions and sentences, arguing (1) the State presented insufficient evidence to support his conviction of burglary under K.S.A. 2015 Supp. 21-5807(a)(1); (2) the State committed prosecutorial error during closing argument; and (3) the district court erred in denying the application of jail time credits to his sentences in this matter. For reasons we explain below, we affirm Bennett's convictions and sentences.

1

In February 2016, the State charged Bennett in case 16 CR 17 with committing four crimes between the dates of August 18 and 20, 2015: two counts of burglary by entering into or remaining within a dwelling with the intent to commit a theft therein and two counts of theft of property worth less than $1,000. The State presented the following evidence at Bennett's jury trial.

On August 18 or 19, 2015, John P. Leon returned home from work to find two suitcases and another bag lying on the floor stuffed full of jerseys, jackets, and shoes. He noticed his dog did not greet him as usual. He believed whoever broke in might still be inside. As Leon walked through the house, he noticed a lot of his bags were missing, such as cologne and duffel bags. He soon realized no one was inside and called the police. Leon testified he saw no one run from the home. When the police arrived, Leon informed them someone had broken in, entered his house, and taken various items.

Corporal Waylon Kepley of the Parsons Police Department was the first officer to arrive at Leon's home to investigate the reported burglary and theft. Leon met Kepley outside, took him to the side of the house, and showed Kepley where he believed the individual entered. Kepley saw a screen had been removed and was located a little farther away by a bush. Leon then led Kepley inside the house. Once inside, Kepley observed that a window had been removed and placed inside of the bedroom. Kepley found the house ransacked, stating there were clothes and items scattered all over the place. Leon told Kepley he believed whoever came into his home went into and took beer from his refrigerator, and Leon pointed out various other missing items, including a PlayStation 4; a PlayStation 3; a Blu-Ray player; about 20 PlayStation 3 and PlayStation 4 games; an HP laptop; a cordless Dewalt drill, its attachments and charger; a gray Nike hoodie; a checkbook; his prescription medication; a 30-pack of Bud Light; spare keys to his truck; a Samsung Galaxy phone; and a Samsung Galaxy 3 phone.

2

On August 19 or 20, 2015, Heather Jacquinet called the police to report a burglary and theft at her home. Kepley was dispatched to Jacquinet's home. Jacquinet told Kepley she was in the process of moving out and had not been at the home for some time. When she returned, the front door was locked, but when she walked inside she noticed her things were scattered throughout the house, her couch cushions had been moved, and food from the kitchen freezer was on the floor. As she went to the utility room, she saw the back door was wide open; she exited the house, called her mother, and then called the police. She told Kepley she did not believe many items were missing but noticed a missing jewelry box and antique watch. Police recovered fingerprints from the back door but testing later revealed the fingerprints did not match Bennett.

During the burglary investigations, law enforcement officers obtained a warrant to search Megan Houghton's apartment. At trial, the district court found Houghton unavailable to testify, and the parties presented Houghton's testimony from Bennett's preliminary hearing in a joint exhibit. Houghton admitted the State had given her an immunity offer.

Houghton testified she had been in a relationship with Bennett for a little over two years. She first asked Bennett about Leon when she found Leon's pay stub in the trash can at her apartment. Houghton did not know Leon and had not heard of him before, but Bennett knew Leon through his child's mother. Bennett told Houghton that he and Brandon Perez brought the paystub from Leon's house to the back door of her apartment. Houghton stated they brought other items she did not know belonged to Leon at the time. Houghton remembered seeing a package of bacon, pay stubs, a bunch of paperwork with Leon's name on it, and a cell phone. Houghton was unaware or did not know whether anyone else was involved. Houghton allowed the Parsons Police Department to search her home when the police arrived with a warrant. Houghton testified that the police found items belonging to Leon.

Parsons Police Department Detective Shannon Vail investigated the burglaries, conducted the search of Houghton's apartment, and recovered property from her apartment. Vail and Lieutenant Detective Sherri McGuire completed evidentiary custody receipts (ECRs) of numerous items recovered from Houghton's apartment that were later returned to Jacquinet and to Leon. The police also recovered some of Leon's property from outside of an apartment complex, from inside an apartment in the same complex, and from Perez' grandparents' home. All the property was returned to Leon by the police on August 20 or 21, 2015.

At trial, Leon testified he knew Bennett's family and got to know Bennett when he hired Bennett's ex-girlfriend to work for him. He had also hired Bennett to work for him for about a month or two. Leon later terminated Bennett from the job. Leon stated he is an avid video gamer and had played Call of Duty online with Bennett a few times. He never gave Bennett permission to enter his house and did not grant Bennett permission to take or borrow items from his house. His house had been broken into only that one time. While some of his missing property was returned to him, Leon testified he never received three cell phones, a jar of money he saved for vacations, his prescription medications, some Nike shoes, and a Nike jacket. He also discovered there were items taken from his storage closets that he did not realize were missing until he later moved.

Following the presentation of evidence, the jury found Bennett guilty of counts one and two—the burglary of Leon's home and theft of Leon's property worth less than $1,000—but acquitted Bennett of counts three and four—the burglary of Jacquinet's home and the theft of her property worth less than $1,000.

The district court later held a sentencing hearing for this case as well as a previous case, 15 CR 194, where Bennett had been convicted of possession of a controlled substance, possession of drug paraphernalia, and criminal trespass. Bennett requested the district court divide his jail time credits between the two cases and apply some jail time

4

credits to other cases that remained pending for trial. The State argued the district court should apply all the jail time credits to Bennett's first sequential sentence ordered, 15 CR 194, as the presentence investigation (PSI) report for 15 CR 194 recommended. The record on appeal does not contain the PSI for 15 CR 194. The PSI for this case reflected that Bennett had jail time credits for 196 days in custody from 01/28/2016 to 08/10/2016 and 416 days in custody from 11/19/16 to 01/08/2018. The district court held Bennett had acquired a total of 646 days of jail time credit in 15 CR 194 at the time of the sentencing hearing.

Ultimately, the district court sentenced Bennett to a 24-month underlying prison sentence in 15 CR 194 but granted him 12 months' probation. The district court applied all 646 days of Bennett's jail time credit to the 15 CR 194 sentence. In 16 CR 17, the district court applied a special rule because Bennett committed the crimes while on felony bond and sentenced Bennett to 16 months in prison for his burglary conviction and 12 months in jail for his theft conviction. The district court ordered his sentences in 16 CR 17 to run concurrent with each other but consecutive to his prior sentences.

Bennett timely appeals.

I.    DID THE STATE PRESENT SUFFICIENT EVIDENCE TO SUPPORT BENNETT'S
      BURGLARY CONVICTION?

Bennett mainly argues the State presented insufficient evidence he had the intent to commit theft because the jury had to engage in impermissible inference stacking when reviewing the circumstantial evidence.

> "'When the sufficiency of the evidence is challenged in a criminal case, this court
> reviews the evidence in a light most favorable to the State to determine whether a rational
> fact-finder could have found the defendant guilty beyond a reasonable doubt.' '"In making

5

a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility."' An appellate court will reverse a guilty verdict even if the record contains some evidence supporting guilt only in rare cases when the court determines that evidence was so incredulous no reasonable fact-finder could find guilt beyond a reasonable doubt. [Citations omitted.]" *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

K.S.A. 2018 Supp. 21-5807(a)(1) defines burglary as: "[W]ithout authority, entering into or remaining within any: (1) Dwelling, with intent to commit a felony, theft or sexually motivated crime therein." The district court instructed the jury:

"The defendant is charged in Count 1 with Burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant entered a dwelling [in] Parsons, KS.

"2. The defendant did so without authority.

"3. The defendant did so with the intent to commit a theft therein.

"4. This act occurred between the 18th day of August, 2015 and the 20th day of August, 2015, in Labette County, Kansas."

As Bennett points out in his brief,

"convictions based entirely upon circumstantial evidence 'can present a special challenge to the appellate court' because 'the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.' Where the State relies on such inference stacking, *i.e.*, where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence. [Citations omitted.]" *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017).

6

However, while the State cannot "rely upon the theory that presumption A leads to presumption B leads to presumption C leads to fact D, it is perfectly proper for the State's case to be grounded upon a theory that presumption A, presumption B, and presumption C all separately point to fact D." 306 Kan. at 861.

Although Bennett presents his claims on appeal differently, the main issue is that Houghton's testimony only has Bennett bringing items from Leon's home to her apartment. Bennett contends that testimony was used by the jury to draw an inference or make a presumption that Bennett entered the house, which he admits the jury was allowed to do. Bennett then contends *Banks* does not allow the use of that inference to be used with the inference that he was in possession of stolen property to make the third inference that he entered the house with the intent to commit a felony therein.

> "Gauging intent is often an imprecise task. Jurors must determine what is going on inside a person's head, and criminals routinely disavow any bad purpose. Jurors are left to survey the circumstances to discern a defendant's actual intent. So it is in ferreting out whether someone has the requisite intent to commit a theft, thereby supporting a conviction for burglary, aggravated burglary, or, in this case, an attempt. See *State v. Harper*, 235 Kan. 825, Syl. ¶ 2, 685 P.2d 850 (1984); *State v. Wilson*, 45 Kan. App. 2d 282, 288, 246 P.3d 1008, *rev. denied* 292 Kan. 969 (2011). The jurors may consider 'the totality of the surrounding circumstances,' in a burglary prosecution, including 'the manner of the entry, the time of day, the character and contents of the building, the person's actions after entry . . . , and the intruder's explanation, if he or she decides to give one.' *Harper*, 235 Kan. 825, Syl. ¶ 2." *State v. Hargrove*, 48 Kan. App. 2d 522, 564-65, 293 P.3d 787 (2013).

But the record shows more evidence from which the jury could conclude there was an intent to commit a felony on entry into the house rather than engaging in inference stacking. Leon testified he returned home from work to find his home broken into and discovered various items had been taken and were missing. Leon testified he never gave Bennett authority to enter his home or to borrow items from his home. The ECRs dated

7

the reported burglary of Leon's home as August 18, 2015. During the search of Houghton's apartment, the police recovered many items Leon reported stolen and returned the items to him by August 20, 2015. Law enforcement officers testified the entry into Leon's home was likely made by removing a screen from the outside of the home and removing a window. Thus, the State presented sufficient evidence Bennett lacked authority to enter Leon's home and that the burglary of Leon's home occurred on or between August 18 and 20, 2015.

Under *Hargrove*, the State presented sufficient evidence that whoever entered Leon's home had the intent to commit theft. The individual's or individuals' actions after entering Leon's home demonstrate an intent to commit a theft—the interior was ransacked with clothes and items strewn all over, and Leon reported many valuable items were missing. Under the totality of the circumstances, the State presented sufficient evidence to support the element that whoever entered Leon's home had the intent to commit theft. This evidence was sufficient without the need to stack the inference that Bennett was the individual to enter the home.

As stated above, the main issue on appeal is whether the State presented sufficient evidence that Bennett committed the burglary by entering Leon's home with an intent to commit theft. Leon testified he saw no one inside of his home and he saw no one fleeing from his home when he returned from work. The State had no eyewitness testimony or physical evidence—fingerprints or DNA—linking Bennett to the burglary of Leon's home. But Houghton testified that Bennett and Perez took items from Leon's home and brought them to her apartment. Thus, Houghton's testimony places Bennett at Leon's home.

Bennett argues the jury made three impermissible inferences to find he committed the burglary of Leon's home based on Houghton's testimony. Bennett first argues the jury made a questionable inference that he entered Leon's home because it was equally

8

plausible only Perez entered the home and took all the property. Bennett tries to draw a comparison to *State v. Williams*, 229 Kan. 646, 630 P.2d 694 (1981), where our Supreme Court denied the State's request for a rehearing of its decision reversing the defendant's convictions as based on insufficient evidence. There, our Supreme Court found the State rested its circumstantial evidence on an inference two people committed the crimes. Our Supreme Court held, however, the State failed to meet its burden because the jury had to make a questionable inference to convict Williams because the circumstantial evidence also could have supported an inference only one person committed the crimes. 229 Kan. at 653-54.

Bennett's argument lacks merit because while Houghton said she thought Perez was involved, she testified that Bennett told her he brought items from Leon's house to her apartment. Thus, a jury could find Bennett took items from Leon's house to Houghton's apartment.

Bennett's argument is also flawed because several circumstances support the fact Bennett entered Leon's home. Houghton remembered seeing items belonging to Leon at her apartment, and several of Leon's items were found at her apartment. Based on Houghton's testimony, Bennett and Perez brought other items from Leon's home. A jury could reasonably infer a person needed to enter Leon's home to bring these items to Houghton's apartment. Thus, the State presented sufficient circumstantial evidence Bennett entered Leon's home.

Next, Bennett argues the jury had to draw a questionable inference he took *all* the items reported stolen from Leon's home because Houghton only testified he took Leon's paystubs, documents, and cell phone—none of which were reported stolen or were recovered. This argument also lacks merit. Houghton testified that Bennett and Perez brought to her apartment the items she remembered seeing that were later identified as belonging to Leon. Many of the items Leon reported stolen were later recovered at

9

Houghton's apartment. Based on the State's evidence, the jury drew a reasonable inference that Bennett took more items from Leon's house than what Houghton saw in her apartment.

Relying on *State v. Wilkins*, 215 Kan. 145, 523 P.2d 728 (1974), Bennett next argues the jury made a questionable inference to find he had possession of recently stolen property. But his reliance on *Wilkins* is misplaced. There, a gun was stolen from a pickup truck parked outside a store. A few hours later, a patrol officer observed Wilkins shooting a gun in the Wichita city limits, arrested Wilkins, and learned the gun had recently been reported stolen. Our Supreme Court held sufficient evidence supported Wilkins' burglary and theft convictions because:  "Possession by an accused of property recently stolen in a burglary is sufficient to sustain a conviction of burglary and theft where satisfactory explanation for such possession is not given." 215 Kan. at 147. Notably, a conviction of burglary does not require the State to prove the defendant had possession of recently stolen property. See K.S.A. 2018 Supp. 21-5807(a)(1). In addition, the *Wilkins* court did not review if the State presented sufficient evidence that Wilkins had an intent to commit theft. Based on these differences, Bennett's reliance on *Wilkins* is misplaced.

The totality of the circumstances surrounding the burglary of Leon's home supports that the person or persons who entered the home had an intent to commit theft. Houghton's testimony implicated Bennett in the crimes against Leon as having taken items from Leon's home around the timeframe Leon reported the burglary; Bennett's statements to Houghton placed Bennett at Leon's home; and some of the items reported missing from Leon's home were later recovered at Houghton's apartment. In reviewing the evidence in the light most favorable to the State, sufficient evidence supports the jury finding that Bennett entered Leon's home with an intent to commit a theft.

II. DID THE STATE COMMIT PROSECUTORIAL ERROR DURING CLOSING ARGUMENT?

Bennett argues the prosecutor committed two prosecutorial errors based on misstatements of Houghton's testimony during closing argument.

Appellate courts review claims "of prosecutorial error during closing argument regardless of whether the defendant raised a contemporaneous objection." *State v. Pribble*, 304 Kan. 824, 831, 375 P.3d 966 (2016). In reviewing prosecutorial error, appellate courts employ a two-step process

> "simply described as error and prejudice. [First,] the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. . . . [P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt . . . there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case." 305 Kan. at 110.

A. *Did the prosecutor misstate the evidence during closing argument?*

"'Prosecutors enjoy wide latitude in crafting closing arguments . . . [, but] a prosecutor's arguments must remain consistent with the evidence.'" *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017) (quoting *Pribble*, 304 Kan. at 832). Moreover, "it is clearly improper for a prosecutor to state facts that are not in evidence. But, on the other

11

hand, prosecutors are allowed '"to craft arguments that include reasonable inferences to be drawn from the evidence."' [Citations omitted.]" *Banks*, 306 Kan. at 862.

Bennett first claims the prosecutor committed error during closing argument when the prosecutor stated: "Megan Houghton said that all the property was brought there by Mr. Bennett." In context, the prosecutor was referring to the evidence surrounding Bennett's alleged theft of property from and burglary of Jacquinet's home. Second, Bennett mainly argues the prosecutor committed error in referring to the amount of property Houghton actually testified to Bennett telling her he brought from Leon's house to her apartment.

The prosecutor stated during closing rebuttal:

"Just follow the property, just follow it. Remember she testified that they had been in a relationship for two years. This wasn't just some girl who didn't know Brad, didn't know Mr. Bennett. This is her boyfriend.

"So what does she testify to? She testified that she found a pay stub for John Leon in her trash can. She testified that she asked him about it. *Mr. Bennett told her he brought it from Mr. Leon's house, along with all the other property*, and he brought it from the house to the back door of her apartment.

. . . .

"The property went from Mr. Leon's house and Ms. Jacquinet's house to Megan Houghton's house. How did it get there? Mr. Bennett. How do we know that? His girlfriend testified to that. It went from Megan's house to the police station. How do we know that? We have lists that say the officers picked it up and the officers took it and they put it down on their list. And where did it go from there? It went back to the rightful owners. That's the property. That is the circle of life for this property." (Emphasis added.)

The prosecutor misstated Houghton's testimony. The State acknowledges the misstatement of Houghton's testimony but argues the prosecutor made a reasonable inference from the evidence. Houghton stated Bennett told her he brought "it"—Leon's pay stub—from Leon's house to the back door of her apartment. Houghton did not testify Bennett told her he brought Leon's pay stub, *along with all the other property,* to the back door of her apartment, and Houghton did not testify that Bennett told her he brought the property from Jacquinet's home. The misstatements were not reasonable inferences from the evidence; thus, the prosecutor committed error in misstating Houghton's testimony.

B.    *Did the prosecutor's error prejudice Bennett?*

Moving to the second step, Bennett acknowledges that the jury requested and the district court had the court reporter read back Houghton's testimony during the deliberations. Bennett argues, however, while the read-back of the testimony could have cured the prosecutor's error, the ambiguity of the testimony also could have allowed jurors to rely on the prosecutor's misstatements of evidence in finding him guilty of the crimes. The State argues the error did not prejudice Bennett.

In reviewing the evidence supporting Bennett's convictions, Houghton's testimony played a crucial role in linking Bennett to the crimes against Leon. Defense counsel discussed Houghton's motive for testifying based on her grant of immunity and her possession of the stolen property, and he reminded the jury to consider the actual statements and to judge the credibility of those statements. After closing rebuttal and during deliberations, at the request of the jury, the court reporter read Houghton's testimony to the jury.

At the beginning of closing argument the State reminded the jury that counsels' statements were not facts. The district court also instructed the jury that statements and remarks by counsel were not evidence and statements not supported by evidence should

13

be disregarded. Importantly, the jury acquitted Bennett of the burglary of Jacquinet's home and theft of her property. While the prosecutor committed error during closing rebuttal by misstating a witness' testimony, we find the prosecutor's error did not prejudice Bennett and was harmless.

III.    DID THE DISTRICT COURT ERR IN APPLYING BENNETT'S JAIL TIME CREDITS?

Bennett next argues the district court erred in applying all of his jail time credits to his sentence in 15 CR 194, where he received probation, and in denying his request to apply those jail time credits instead to his 16-month prison sentence in 16 CR 17 on which he was being held at the same time and did not receive probation. The State argues the district court had discretion to order all the jail time credits to apply to Bennett's sentence in 15 CR 194. We agree.

From a fairness standpoint, the district court arguably could have applied some of Bennett's jail time credits to his prison sentence in 16 CR 17 under the circumstances. However, that issue is not before us. It is clear Bennett is entitled to jail time credit for all time he was held pending sentencing. If he had been held on only one case, there would naturally be no issue. But he was held on two cases simultaneously, and he wants to choose to which case the credits should apply. Naturally, he wishes them applied to the case that he was ordered to serve the prison sentence.

Bennett argues the district court would not have had discretion and erred in applying K.S.A. 2018 Supp. 21-6615(a) to his sentence of probation in 15 CR 194 instead of to his sentence of prison in 16 CR 17. While Bennett recognizes defendants granted probation have underlying prison sentences, he argues a defendant placed on probation is not sentenced to confinement within the meaning of K.S.A. 2018 Supp. 21-6615(a). We find no precedence on this exact issue and are left to the interpretation of the statute.

14

Interpretation of statutes presents a question of law subject to de novo review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015); see also *State v. Harper*, 275 Kan. 888, 891, 69 P.3d 1105 (2003) (interpreting prior codification of jail time credit statute K.S.A. 21-4614).

"When interpreting statutes, we begin with "'the fundamental rule that [courts] give effect to the legislature's intent as it is expressed in the statute. Courts must apply a statute's language when it is clear and unambiguous, rather than determining what the law should be, speculating about legislative intent, or consulting legislative history."' We derive legislative intent by first applying the meaning of the statute's text to determine its effect in a specific situation. 'It is only when the language is unclear or ambiguous that the court employs the canons of statutory construction, consults legislative history, or considers other background information to ascertain the statute's meaning.' [Citations omitted.]" *Collins*, 303 Kan. at 474.

K.S.A. 2018 Supp. 21-6615(a) states:

"In any criminal action in which the defendant is convicted, the judge, *if the judge sentences the defendant to confinement*, shall direct that for the purpose of computing defendant's sentence and parole eligibility and conditional release dates thereunder, that such sentence is to be computed from a date, to be specifically designated by the court in the sentencing order of the journal entry of judgment. Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case. In recording the commencing date of such sentence the date as specifically set forth by the court shall be used as the date of sentence and all good time allowances as are authorized by the secretary of corrections are to be allowed on such sentence from such date as though the defendant were actually incarcerated in any of the institutions of the state correctional system." (Emphasis added.)

15

K.S.A. 2018 Supp. 21-6615 does not define confinement. The definitions in K.S.A. 2018 Supp. 21-6603, likewise, do not include a definition for confinement, but the statute does contain definitions which may shed some light onto the Legislature's intent.

"(c) '[C]orrectional institution' means any correctional institution established by the state for the confinement of offenders, and under control of the secretary of corrections.

. . . .

"(g) 'probation' means a procedure under which a defendant, convicted of a crime, is released by the court *after imposition of sentence, without imprisonment except as provided in felony cases*, subject to conditions imposed by the court and subject to the supervision of the probation service of the court or community corrections. In felony cases, the court may include confinement in a county jail not to exceed 60 days, which need not be served consecutively, as a condition of an original probation sentence and up to 60 days in a county jail upon each revocation of the probation sentence pursuant to subsection (b)(3) of K.S.A. 2018 Supp. 21-6702, and amendments thereto." (Emphasis added.) K.S.A. 2018 Supp. 21-6603(c) and (g).

Black's Law Dictionary 373 (11th ed. 2019) defines confinement as "[t]he act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained." Black's Law Dictionary 1456 defines probation as "[a] court-imposed criminal sentence that, subject to stated conditions, releases a convicted person into the community instead of sending the criminal to jail or prison, usu. on condition of routinely checking in with a probation officer over a specified period of time."

"Under Kansas law, a judge who sentences a defendant to confinement is required to grant credit for the time which the defendant spent incarcerated pending the disposition of his or her case. K.S.A. 21-4614 [now K.S.A. 2018 Supp. 21-6615(a)]; *State v. Golston*, 269 Kan. 345, Syl. ¶ 1, 7 P.3d 1132 (2000). 'The provisions of K.S.A. 21-4614 are mandatory and require that a criminal defendant sentenced to incarceration be

16

given credit for all time spent in custody solely on the charge for which he is being sentenced. [Citation omitted.]' *State v. Calderon*, 233 Kan. 87, 97, 661 P.2d 781 (1983)." *Harper*, 275 Kan. at 890.

We also find guidance in K.A.R. 44-6-134(d) (2018 Supp.), which states: "Jail credit shall be awarded for time spent in custody by an offender pending disposition of charges if consecutive guidelines sentences are imposed on the same date. However, the credits shall be computed so that they do not overlap from one sentence into any other sentence." A defendant has a statutory right to jail time credits, and "'[j]ail time credit' must be determined by the sentencing court and included in the journal entry at the time the trial court sentences the defendant to confinement." *State v. Theis*, 262 Kan. 4, 7, 936 P.2d 710 (1997). Generally, a defendant granted probation and jail time credits from time spent incarcerated during the pending disposition of his or her case receives jail time credits if or when probation is revoked. See, e.g., *Worrell v. State*, No. 97,611, 2008 WL 762514, at *2 (Kan. App. 2008) (unpublished opinion).

In considering the definitions of confinement and probation in isolation, Bennett's argument of the use of "confinement" in K.S.A. 2018 Supp. 21-6615(a) could support that the Legislature did not intend jail time credits to apply when a defendant is sentenced to probation. But we find probation is considered separate from a sentence under Kansas law.

> "We have previously concluded that a person on probation or parole is not serving a sentence. Probation from serving a sentence is an act of grace by the sentencing judge and, unless otherwise required by law, is a privilege and not a matter of right. *State v. Lumley*, 267 Kan. 4, Syl. ¶ 1, 977 P.2d 914 (1999). This court has repeatedly held that probation is separate and distinct from the sentence. *State v. Van Winkle*, 256 Kan. 890, Syl. ¶ 2, 889 P.2d 749 (1995); *State v. Dubish*, 236 Kan. 848, Syl. ¶ 2, 696 P.2d 969 (1985). Probation and parole are dispositions alternate to the serving of a sentence, and neither probation nor parole increase or decrease the sentence required to be imposed by statute. *Cf. Hudson*, 273 Kan. at 251.

17

"The determination that probation is separate and distinct from the sentence is demonstrated by the fact that an individual can be placed on probation for more or less time than the length of his or her underlying prison sentence. See K.S.A. 2001 Supp. 21-4611. Additionally, even when an individual's probationary term has almost been satisfied and probation is revoked, the person must still serve the entire length of the underlying prison sentence and will be denied credit for time spent on probation unless it was time spent in a county jail or a residential treatment center. See K.S.A. 21-4614a. It is also noteworthy that an individual may either accept probation and be subject to serving the entire sentence if his or her probation is revoked or reject probation and elect to serve a known sentence." *State v. Carr*, 274 Kan. 442, 451, 53 P.3d 843 (2002).

See also *State v. Kinder*, 307 Kan. 237, 240-43, 408 P.3d 114 (2018) (holding district court lacked jurisdiction to sentence defendant to 18 months' probation when jail time credits before disposition of case provided defendant had served underlying 9-month prison term).

We conclude K.S.A. 2018 Supp. 21-6615(a) does not mandate a district court to apply jail time credits earned to the prison sentence chosen by the defendant when a defendant has two separate cases pending in the same county and the defendant was sentenced to prison sentences on both cases but granted probation in one case. Here, the district court sentenced Bennett in 15 CR 194 to an underlying prison sentence. Because probation is a procedure separate and distinct from an underlying prison sentence—a sentence of confinement—the district court did not err in applying all the jail time credits to Bennett's sentence in 15 CR 194. See K.S.A. 2018 Supp. 21-6603(g); *Carr*, 274 Kan. at 451.

In conclusion, we find there was sufficient evidence to support Bennett's convictions; while the prosecutor erred during closing argument, the error was harmless

and Bennett was not prejudiced; and the district court did not err in applying Bennett's jail time credits.

Affirmed.